```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3

 4    UNITED STATES OF AMERICA,

 5                    Plaintiff,

 6    -v-                                    Case No. 23-cr-20152

 7

      JACK EUGENE CARPENTER, III,
 8
                      Defendant.
 9    _____/

10

11                        COMPETENCY HEARING

12              BEFORE THE HONORABLE MARK A. GOLDSMITH

13         Detroit, Michigan, Monday, December 11th, 2023.

14

15    APPEARANCES:

16    FOR THE PLAINTIFF:      FRANCES LEE CARLSON
                              HANK MOON
17                            U.S. DEPARTMENT OF JUSTICE
                              211 West Fort Street
18                            Suite 2001
                              Detroit, MI 48226
19

20    FOR THE DEFENDANT:      JEAN PIERRE NOGUES, III
                              Federal Community Defender
21                            613 Abbott Street
                              Suite 500
22                            Detroit, MI  48226

23

24    David B. Yarbrough, CSR, FCRR
      Official Court Reporter
25    (313) 234-2619
```

TABLE OF CONTENTS

                                                           PAGE

WITNESSES FOR THE GOVERNMENT:

RYAN NYBO, PSY.D.

   Direct Examination by Ms. Carlson                          4
   Voir Dire Examination by Mr. Nogues                       15
   Cross-examination by Mr. Nogues                           44
   Redirect Examination by Ms. Carlson                       57
   Recross-examination by Mr. Nogues                         62

The Government Rests                                         64

WITNESSES FOR THE DEFENSE:

JACK CARPENTER

   Direct Examination by Mr. Nogues                          65
   Cross-examination by Mr. Moon                             70

The Defense Rests                                            94

Matter Taken Under Advisement by the Court                  94

EXHIBITS

| | (Identified) | (Admitted) |
|---|---|---|
| Govt. Ex. 1 | 12 | 13 |
| Govt. Ex. 2 | 18 | 19 |
| Govt. Ex. 15 | 27 | 27 |
| Govt. Ex. 16 | 28 | 29 |
| Govt. Ex. 3 | 71 | 72 |
| Govt. Ex. 4 | 72 | 73 |
| Govt. Ex. 5 | 73 | 74 |
| Govt. Ex. 6 | 74 | 74 |
| Govt. Ex. 14 | 82 | 83 |

```
 1            Detroit, Michigan.
 2            Monday, December 11th, 2023.
 3            At or about 2:42 p.m.
 4                     --    ---    --
 5            THE CLERK OF THE COURT:  Please rise.  The United
 6    States District Court for the Eastern District of Michigan is
 7    now in session, the Honorable Mark Goldsmith presiding.  You
 8    may be seated.
 9            The Court calls case number 23-20152, United States
10    of America versus Jack Carpenter.  Counsel, please place your
11    appearance on the record.
12            MS. CARLSON:  Good afternoon, your Honor.  Francis
13    Carlson appearing on behalf of the United States.
14            MR. MOON:  And Hank Moon on behalf of the United
15    States as well.
16            MS. CARLSON:  And also at government's table is Maria
17    Cook, a paralegal with our office.
18            THE COURT:  Good morning.
19            MR. NOGUES:  And good afternoon --
20            THE COURT:  I'm sorry, good afternoon.
21            MR. NOGUES:  Good afternoon, your Honor.  Jean Pierre
22    Nogues from the Federal Community Defender Office on before
23    Jack Carpenter who stands to my left.
24            THE COURT:  All right, good afternoon.  Have a seat
25    everybody.  Just make sure you are in front of a microphone so
```

```
 1    we can hear you.  All right.  We are here today for a
 2    competency hearing.  Everyone ready to proceed?
 3              MS. CARLSON:  The government is.
 4              MR. NOGUES:  So is the defense, your Honor.
 5              THE COURT:  Okay.  Go ahead, counsel.
 6              MS. CARLSON:  The government will call Ryan Nybo the
 7    to stand.
 8              THE COURT:  All right.  Sir, if you want to step
 9    forward, here's our witness stand right here.
10              THE CLERK OF THE COURT:  Please raise your right
11    hand.  Do you solemnly swear or affirm under penalty of perjury
12    the testimony you're about to give in the cause now pending
13    before this Court shall be the truth, the whole truth and
14    nothing but the truth?  If so, state I do.
15              DR. NYBO:  I do.
16              THE COURT:  Have a seat.  That microphone does move
17    around on that ledge.  Make sure you keep your voice up as you
18    speak and tell us your full name please and spell it?
19              THE WITNESS:  Ryan Nybo, R-y-a-n, N-y-b-o.
20              THE COURT:  Go ahead, counsel.
21                      R Y A N   N Y B O, P S Y. D,
22    Called as a witness by the Government at 2:43 p.m. and having
23    been first duly sworn, testified as follows:
24                           DIRECT EXAMINATION
25    BY MS. CARLSON:
```

```
1    Q.   How are you employed?
2    A.   I'm a forensic unit psychologist with the Bureau of
3    Prisons.
4    Q.   And how long have you had that position?
5    A.   I have been in the forensic unit since 2010, so almost 14
6    years now.
7    Q.   And you are a psychologist?
8    A.   Yes, I am.
9    Q.   And are you licensed do practice in that field?
10   A.   Yes, I'm a licensed psychologist in the state of
11   Washington.
12   Q.   And when did you -- when did you receive your license?
13   A.   September, 2007.
14   Q.   So what does it take to become a licensed psychologist in
15   the state of Washington?
16   A.   Well, you first have to have a doctorate degree and
17   complete all the course work associated with that.  As part of
18   that, the requirements in the state of Washington are also to
19   complete a 2000 hour predoctoral internship as well as practica
20   experiences at various sites so that you both get the academic
21   as well as a practical, umm, experiences.  Also we have to
22   complete a dissertation as well as complete clinical competency
23   exams as part of the doctorate.
24   Q.   And you said that you obtained that license in 2007?
25   A.   Yes, I did.
```

1   Q.   And does the state of Washington have requirements in

2   order to maintain your license?

3   A.   Yes.

4   Q.   And what are those requirements?

5   A.   I have to complete 60 units of continued education every

6   three years.

7   Q.   Can you please tell us a little bit about your educational

8   background?

9   A.   Yes.  I have a bachelor's degree from the Berkley College

10  of Music in Boston.  I have master's of education in, from

11  Boston University in counseling and sports psychology.  I have

12  a master's degree in clinical psychology from Argus University

13  and I have a doctorate of psychology from Argus University as

14  well.

15  Q.   And when did you obtain your doctorate?

16  A.   2006.

17  Q.   And you said that in college you have a bachelor of music?

18  A.   Bachelors of music, yes.

19  Q.   And what was your major there?

20  A.   Music therapy.

21  Q.   Now prior to beginning your doctorate program, did you do

22  a predoctoral internship?

23  A.   I completed one as part of my doctoral program.

24  Q.   And what does -- tell us about the predoctoral internship?

25  A.   I completed a full year internship at the University of

1   Puget Sound in their counseling, health and wellness center.

2   Q.   And that was, I'm sorry, a year program?

3   A.   One year.

4   Q.   And after obtaining your doctor of psychology, what did

5   you do?

6   A.   After I graduated, I completed a year-long post-doctorate

7   fellowship at the University of Idaho.

8   Q.   And what was that fellowship in?

9   A.   Counseling and psychology, I also did some advanced

10  testing as well when I was there.

11  Q.   And I'm sorry, you said that you obtained your doctorate

12  degree in 2006?

13  A.   Yes.

14  Q.   And immediately thereafter you did the fellowship?

15  A.   Yes.

16  Q.   And how long was that fellowship?

17  A.   It was a year.

18  Q.   Following the conclusion of that fellowship, then what did

19  you do?

20  A.   I was hired as a staff psychologist at the Federal Bureau

21  of Prisons at FDC Sea Tac.

22  Q.   FDC stands for federal detention center?

23  A.   Yes.

24  Q.   And Sea Tac, where is that facility that located?

25  A.   Just south of Seattle, between Seattle and Tacoma,

1    Washington.

2    Q.   And when you were hired on by the Bureau of Prisons a FDC

3    Sea Tac, what your position?

4    A.   I was staff psychologist.  I was the mental health

5    treatment coordinator for the facility.

6    Q.   And generally what were your responsibilities in that

7    role?

8    A.   I took are of all the mental health needs for the inmate

9    population there providing therapy, triage, group treatment,

10   crisis management, managed suicide watches.  Anything mental

11   health related, I managed there.

12   Q.   And how long did you hold that position?

13   A.   Approximately two years.

14   Q.   Did you then transition to a new role at the Bureau of

15   Prisons?

16   A.   Yes, I did.

17   Q.   And what was that?

18   A.   Umm, I what hired into the forensic unit where I

19   transitioned from doing treatment to evaluations.

20   Q.   And so I think earlier you said your title was forensic

21   unit psychologist?

22   A.   Yes.

23   Q.   And was that position also at FDC Sea Tac?

24   A.   Yes.

25   Q.   Now generally what the responsibilities of a forensic unit

1    psychologist

2    A.   So, we conduct court-ordered forensic evaluations for the

3    United States District Courts throughout the United States.

4    Q.   And what kind of evaluations?

5    A.   Competency and criminal responsibility.

6    Q.   And when you are a court-ordered evaluator, what is your

7    role in relation to the case I guess that you're evaluating

8    for?

9    A.   Well, we're a neutral, independent party so we're, umm, we

10   provide information regarding that, that that's our role and

11   then we assess for competency or whatever the court order

12   suggests that we should be evaluating.

13   Q.   And in that role, are you also called to testify in

14   federal court in various judicial proceedings?

15   A.   Yes.

16   Q.   And are you testifying as a defense witness or prosecution

17   witness?

18   A.   I've been called for both.

19   Q.   And that's that you are a neutral examiner?

20   A.   Yes.

21   Q.   Now as far as the court-ordered competency evaluations,

22   what do those evaluations consist of?

23   A.   They typically consist of a clinical interview where I try

24   to gather a social history of the person as well as conduct any

25   relevant testing that the referral question might be.  If the

1  person has an intellectual issue, I might do cognitive,

2  personality testing, neurological testifying.  I also try to

3  gather other sources of information such as any legal records,

4  any mental health records that might be available.  I reach out

5  to both parties and try to obtain that record and then at the

6  conclusion of the evaluation, we typically administer some sort

7  of competency-related measure so I typically would administer

8  the revised competency assessment instrument where there's 14

9  parts to it and asks about the various aspects associated with

10  the Dusky standard which we use to evaluate competence.

11  Q.  And at the end of your evaluation, what are your

12  responsibilities?

13  A.  Well, I compile all the data.  I write a report and I

14  submit it to the Court.

15  Q.  And that report typically consists of your opinion

16  regarding -- if was a competency evaluation that was ordered by

17  the Court, then would you arrive at an opinion if you have one?

18  A.  Yes.  I arrive at a diagnosis, opinion, those such things.

19  Q.  And is there also a recommendation as to the defendant?

20  A.  Yes.

21  Q.  Now when you transitioned to the role as forensic unit

22  psychologist, did that require any further education or

23  training?

24  A.  I underwent a year of more close supervision once I

25  obtained that position so I was, I had a reduced caseload and I

1    was supervised by senior forensics psychologists in the Bureau

2    of Prisons for that year so, umm, I traveled to MDC LA which is

3    a hub for competency evaluations, I did some training down

4    there.  I went to the Federal Medical Center at Springfield.  I

5    trained there.  I was also mentored by the psychologist there

6    as well, senior forensic psychologist so that first year was

7    really a slow caseload and really reviewing and getting

8    supervision on any of those forensic cases.

9    Q.  And said you transitioned to that role in, some time in

10   2010?

11   A.  2010, yes.

12   Q.  So you have been a forensic unit psychologist at Sea Tac

13   for close to 14 years?

14   A.  Yes.

15   Q.  In those 14 years, about how many competency evaluations

16   would you say that you have conducted?

17   A.  I've completed roughly 350.

18   Q.  How about criminal responsibility evaluations?

19   A.  Probably around 100.

20   Q.  Now as part of those responsibilities as a forensic unit

21   psychologist, I think you already said that you're called

22   sometimes to testify in federal court?

23   A.  Yes.

24   Q.  And how many times would you say you have testified in

25   federal court regarding issues of competency?

1  A.   I'll estimate 45 times.

2  Q.   And about how many times have you provided your opinion in

3  a court proceeding as to a defendant's competency?

4  A.   45 times.

5  Q.   Now I'm going to show you, do you have a screen up there

6  that shows, or no?  No?

7  A.   I do have a screen.

8  Q.   Okay.  I'm going he should you what's been marked as

9  government's Exhibit # 1.  Can you see that on your screen?

10  A.   I see nothing on my screen -- there, yes, I see it.

11  Q.   Would it be more helpful to have a paper copy or can you

12  see that up there?

13  A.   I can see it.

14       THE COURT:  That moves by the way.  You can move the

15  monitor up.

16       (Pause)

17  Q.   (By Ms. Carlson, continuing):  All right.  Do you

18  recognize the document that's displayed as government's Exhibit

19  # 1?

20  A.   Yes.

21  Q.   And what is that?

22  A.   That's my CV, my resume.

23  Q.   And does that CV, that consists of approximately nine

24  pages?

25  A.   Yes.

```
 1   Q.  And does that CV reflect what we've discussed about your

 2   education, training and experience that you have related to the

 3   field of forensic psychology?

 4   A.  Yes.

 5           MS. CARLSON:  Your Honor, at this time I'd offer into

 6   evidence government's Exhibit # 1.

 7           MR. NOGUES:  No objection, your Honor.

 8           THE COURT:  Okay.  It's admitted.

 9   Q.  (By Ms. Carlson, continuing):  Now Exhibit 1, your CV,

10   that also includes some experience that we haven't discussed

11   yet today, correct?

12   A.  Yes.

13   Q.  I'm going to give you a paper copy.

14           MS. CARLSON:  May I approach your Honor and just give

15   him a paper copy?

16           THE COURT:  Yes, you can approach freely.

17           THE WITNESS:  I think I've got it stable now.

18   Q.  (By Ms. Carlson, continuing):  Now on, umm, if you turn to

19   page five of that Exhibit, at the bottom of page five you list,

20   you have aheading that says selected professional development,

21   correct?

22   A.  Yes.

23   Q.  And what is that listing that I guess lasts the next few

24   pages?

25   A.  Those are just, umm, seminars, continuing education
```

1  courses that I've taken more recently.

2  Q.  And at least the first two that are listed on the bottom

3  of page five, those include courses related to the specific

4  field of forensic psychology, correct?

5  A.  Yes.  I was recently sent to Scottsdale, Arizona to study

6  for a week down there and take advanced courses related to

7  forensic psychology.

8  Q.  And if you turn to the next page, it looks like there was

9  one professional development course that you attended on May

10  7th of 2023.  Do you see that?

11  A.  Yes.

12  Q.  And what was that course?

13  A.  That was Differentiating Delusional Disorder From Extreme

14  Beliefs.  It was a presentation conducted by a psychologist

15  that looked at how to pick apart or how to differentiate these

16  two concepts.  He presented a case study that's fairly famous

17  in Seattle regarding this and it was I think in regards to a

18  death penalty case mitigation.

19  Q.  Okay and the title Differentiating Delusional Disorder

20  From Extreme Beliefs, was that a professional development to

21  kind of learn the difference between the two?

22  A.  Yes, it's becoming a very salient issue with all the stuff

23  going on in the world these days.

24       MS. CARLSON:  Your Honor, at this time I'd offer Dr.

25  Nybo as an expert in the field of forensic psychology.

```
 1              MR. NOGUES:  May I voir dire, your Honor?
 2              THE COURT:  Okay.
 3                       VOIR DIRE EXAMINATION
 4   BY MR. NOGUES:
 5   Q.   Dr. Nybo, you testified that you've conducted
 6   approximately 350 prior forensic evaluations, correct?
 7   A.   Yes.
 8   Q.   And you said that you have given testimony in
 9   approximately 45 different cases?
10   A.   Yes.
11   Q.   And you said that you gave your opinion in those cases, in
12   all 45 of those cases?
13   A.   Yes.
14   Q.   So have there been any cases where you've failed to be
15   qualified as an expert to give testimony?
16   A.   No.
17   Q.   Okay and then this, this development, professional
18   development seminar that you went to in May of 2023, this
19   Differentiating Delusional Disorder From Extreme Beliefs.  You
20   you were an attendee at that presentation, correct?
21   A.   Excuse me?
22   Q.   You were you an attendee at that presentation?
23   A.   It was an online seminar, yes.
24   Q.   Oh, okay, but you were not the presenter?
25   A.   I was not presenter, no, sir.
```

1  Q.  The presenter was Mark D. Cunningham, correct?

2  A.  Yes.

3  Q.  And Mark D. Cunningham was expert giving that

4  presentation?

5  A.  Yes.

6  Q.  You are not staying today that you are specifically an

7  expert on that topic, correct?

8  A.  I did not give that presentation.

9  Q.  And then just a point of clarification, I think I know the

10  answer to this, but on the first page of your CV it indicates

11  that your masters in clinical psychology, it says on route.

12  Does that mean on route to the eventual PhD?

13  A.  Yes.

14  Q.  Okay, so you did receive that?

15  A.  Yes, it was you got it after passing so many courses.  It

16  wasn't a stand-alone masters.

17          MR. NOGUES:  Understood.  Okay.  No further questions

18  your Honor.  I have no objection.

19          THE COURT:  All right.  Then the Court will recognize

20  Dr. Nybo as an expert in the field of forensic psychology.  Is

21  that the area?

22          MS. CARLSON:  Correct.

23          THE COURT:  Okay.

24  Q.  (By Ms. Carlson, continuing):  Dr. Nybo, are you aware

25  whether the Bureau of Prisons received an order from this Court

1    to examine an individual named Jack Carpenter concerning his

2    competency to stand trial?

3    A.   Yes.

4    Q.   And did you -- were you in fact assigned to conduct this

5    court-ordered evaluation?

6    A.   Yes, I was.

7    Q.   And as a part of that evaluation did you have an

8    opportunity to meet with Jack Carpenter face to face?

9    A.   Yes.

10   Q.   For several hours?

11   A.   Yes.

12   Q.   And do you recognize Jack Carpenter in court today?

13   A.   Yes.

14   Q.   And can you just indicate where he is sitting?

15   A.   He's the gentleman in orange.

16          MS. CARLSON:  For the record, indicating the

17   defendant?

18          THE COURT:  Yes.

19   Q.   (By Ms. Carlson, continuing):  Again, you were assigned at

20   Sea Tac to conduct the competency evaluation, correct?

21   A.   Yes.

22   Q.   Now at the end of your evaluation, did you arrive at a

23   diagnosis and opinion regarding the defendant's competency to

24   stand trial?

25   A.   I did.

1   Q.   And as to his diagnosis, did you arrive at a diagnosis?

2   A.   Excuse me?

3   Q.   Did you arrive at a diagnosis for the defendant?

4   A.   Yes, I did.

5   Q.   And what was that diagnosis?

6   A.   I diagnosed Mr. Carpenter with delusional disorder,

7   grandiose and persecutory types.

8   Q.   And we'll discuss the diagnosis in depth in a little bit,

9   what, umm, how about an opinion as to the defendant's

10  competency to stand trial?  Did you render an opinion?

11  A.   Yes.

12  Q.   And what was your opinion?

13  A.   I believe that Mr. Carpenter demonstrated an impaired

14  ability to rationally understand the nature and the

15  consequences of proceedings and an impaired ability to

16  rationally assist counsel in his defense based on my diagnosis

17  of delusional disorder.

18  Q.   And did you prepare a report of your forensic evaluation

19  of the defendant?

20  A.   Yes, I did.

21  Q.   Now on the screen in front of you is government's Exhibit

22  2 and I'll give you a paper copy as well.  Do you recognize

23  that?

24  A.   Yes.

25  Q.   And what is that?

1  A.   That's my forensic report dated October 24, 2003 -- '23,

2  excuse me.

3          THE COURT:  Let me just tell both counsel that you

4  have to stay in front of a microphone when speaking so if you

5  walk away from a microphone, our court reporter can't pick up

6  up what you're saying so if you need to hand something to a

7  witness, you can identify while you're at a microphone what

8  you're handing him, then walk over, hand him what you want,

9  then come back to a microphone and resume your questioning, all

10 right?

11         MS. CARLSON:  Will do.

12         THE COURT:  Thank you.

13 Q.  (By Ms. Carlson, continuing):  On the last page of that

14 report, that is your name?

15 A.   Yes.

16 Q.   And your signature above your name?

17 A.   Yes.

18         MS. CARLSON:  At this time I'd offer as government's

19 Exhibit # 2 the competency evaluation report of Dr. Nybo.

20         MR. NOGUES:  No objection, your Honor.

21         THE COURT:  Okay.  It's admitted.

22 Q.  (By Ms. Carlson, continuing):  Now approximately how long

23 was the study period for your evaluation of the defendant?

24 A.   I think approximately 45 days.  Study periods usually last

25 30 and I had requested an additional 15.

```
1    Q.   You requested that from the court?

2    A.   Yes.

3    Q.   And that was granted?

4    A.   I believe so, yes.

5    Q.   And when did the defendant arrive at FDC Sea Tac?

6    A.   He arrived on July 19th, 2023.

7    Q.   And what happens as soon as the defendant arrives?

8    A.   They go through a screening and booking process so they're

9    screened by medical staff, they're seen by our unit team staff.

10   They're assigned a housing unit, medically screened to include

11   taking TB tests, seeing if they're health enough to be at the

12   facility, those types of things.

13   Q.   Now specifically with regard to the medical screening, are

14   you involved in that at all?

15   A.   I'm not.  That's our medical staff.

16   Q.   And were you, umm, did you obtain records, BOP medical

17   records regarding the screening?

18   A.   Yes.

19   Q.   And is anything addressed regarding psychological concerns

20   or history during the initial screening?

21   A.   Those questions are asked.  Mr. Carpenter denied any

22   problems.

23   Q.   Any medical or psychological problems?

24   A.   Correct.

25   Q.   And when did you first have the opportunity to meet
```

1  Mr. Carpenter?

2  A.  I met him for the first time on July 25th for what we call

3  a forensic intake.

4  Q.  And what's the purpose of the forensic intake?

5  A.  Just to get an overview of the defendant, introduce

6  ourselves, give a little bit of idea about what to expect

7  during the study period, discuss, umm, the limits to

8  confidentiality, those types of things.  We also do a brief

9  clinical interview where we ask questions about their

10  background, their history, if they're, you know, suicidal

11  thoughts, substance abuse, those types of things.

12  Q.  That all happens during the forensic intake meeting?

13  A.  Yeah, it's kind of what the name implies, it's just an

14  intake assessment and then from that information we use to

15  refer to our psychologist or medical staff if additional

16  services are needed.

17  Q.  And again you said that occurred on July 25th?

18  A.  Yes.

19  Q.  And how long did that meeting take?

20  A.  It was on the unit.  I, I would guesstimate about 45

21  minutes for that.

22  Q.  And were you able to successfully complete that forensic

23  intake with the defendant?

24  A.  I didn't get all the information, but I received quite a

25  bit.  He did agree to talk to me.  He was very reticent to

1    participate in this evaluation.  I know he didn't want to be

2    evaluated or come to Seattle.  He didn't think he had any

3    mental health problems or concerns.  He thought it was a ploy

4    on behalf of the government to make him look quote unquote

5    "crazy" and to take away some of his legal defenses, but he did

6    discuss with me a little bit about his thoughts about the

7    COVID-19 vaccine, some of the legal things he's been going

8    through, those types of things.

9    Q.   And during the forensic intake, does that become a part of

10   your evaluation process?

11   A.   It does.

12   Q.   So any behavioral observations of the defendant are part

13   of what you consider in your evaluation?

14   A.   Yes.

15   Q.   When's the next time that you met with the defendant?

16   A.   I met with him again on August 1st.

17   Q.   And what was the purpose of that meeting?

18   A.   I brought him down to my office and that was when we were

19   going to start the kind of clinical or social history

20   background interview.

21   Q.   And what do you mean by social history?

22   A.   Well, I have a structured, umm, outline that I go through

23   where I ask questions about the defendant's background, their

24   family life, their family, any substance abuse, educational

25   history, legal history, anything related to what their, their

1    lives look like and it usually takes anywhere from two to six

2    hours to complete depending upon the person.

3    Q.  And how long was this evaluation, this first interview

4    with the defendant, I guess the second interview?

5    A.  It lasted about two, over two hours.  I think two hours

6    and 15 minutes or so.

7    Q.  And how did that interview go?  Were you able to get this

8    social history and background information from the defendant?

9    A.  Umm, he agreed to speak with me and during that initial

10   part of that interview, we ask about where was his arrest, what

11   were you doing before your arrest, those types of things and

12   Mr. Carpenter spoke quite, umm, intensely about what was going

13   on in his life leading up to the arrest.

14   Q.  Okay and we'll go over those details in a minute, but just

15   as a general matter, did you obtain any social history of the

16   defendant's background at all?

17   A.  I only got information about his mother and father, a

18   little bit about the siblings and that's about it.

19   Q.  And aside from that limited information, did you -- what

20   did the bulk of the interview consist of?

21   A.  Him talking about his various beliefs.

22   Q.  So after this two-hour-15-minute meeting, did you ever

23   meet with the defendant again?

24   A.  I attempted to meet with him again on the unit.  He had

25   sent an e-mail saying that he no longer wanted to meet with me,

1    that the evaluation was under appeal and that it should be

2    halted and that he didn't want to continue anymore.  I tried to

3    meet with him on the unit to try to convince him to come down

4    and continue.  I told him that I got no notice that the

5    evaluation was over from the court, that it was still in effect

6    and I still had to evaluate him and write a report even if he

7    didn't cooperate and I believe that was on August 18th or so

8    when I tried to meet with him again.

9    Q.   And you had indicated that he mailed you to let you know

10   that he was not going to meet with you further, correct?

11   A.   Yes.

12   Q.   And is e-mailing something the defendant would regularly

13   do when he was at the FDC Sea Tac?

14   A.   It really depends on the defendant.  Some defendants write

15   me and ask me well, when am I going to meet with you again or

16   how's my evaluation going, but with Mr. Carpenter, I've never

17   had a defendant deny, not want to participate in an evaluation,

18   but e-mail almost on a daily basis about various things.

19   Q.   And what was the general nature of that e-mail

20   correspondence?

21   A.   Just that the evaluation shouldn't have been ordered, that

22   he's not going to participate in it, various kind of legal

23   doctrines that he kind of espoused to, reasons why he shouldn't

24   have to go through this, those types of things.

25   Q.   Did he discuss some of what his beliefs were in those

1   e-mails?

2   A.   He expressed his belief that the COVID vaccine was not

3   safe or effective and then he was, I know he was upset at that,

4   their institution still had some posters that were posted so he

5   did express his beliefs around those types of issues.  I don't

6   remember him discussing in those e-mails anything specifically

7   about other beliefs and that like he discussed in the

8   interview.

9   Q.   Now in a typical forensic evaluation for competency, about

10  how many hours face to face do you need with a defendant to

11  evaluate him?

12  A.   It really depends on the defendant and the evaluation.

13  I've had, umm, rendered opinions and the individual has refused

14  to meet with me whatsoever and then I've met with defendants

15  for 15 to 20 hours on more complex things so it just depends on

16  that.  So it just is, kind of a case-by-case basis.

17  Q.   And in this case having met with the defendant for

18  approximately three hours, was that enough time for you to

19  evaluate him?

20  A.   Well, I couldn't complete my full evaluation.  I would

21  have liked to get a personal history and had some, conducted

22  some testing with Mr. Carpenter, but with my interview with him

23  during that, umm, that second meeting as well as reviewing the

24  various legal documents and briefs that I was provided, I

25  believe it was enough to render an opinion in this.

1   Q.   So you referenced so materials or information in addition

2   to your face-to-face meetings with the defendant that you

3   reviewed and relied upon for your evaluation, correct?

4   A.   Yes.

5   Q.   And what kind of things did you review?

6   A.   Well, I've reviewed the criminal complaint, various

7   motions filed by the defendant, the United States' supplemental

8   exhibits regarding psychiatric or psychological examination, I

9   looked at that.  I looked at a brief from the United States'

10  reply to the competency evaluation, the defendant's response in

11  opposition to that evaluation were some of those documents that

12  I looked at.

13  Q.   Did you review any records that were provided by the

14  government?

15  A.   Yes.

16  Q.   Did you review a report of his post -- of the defendant's

17  post-arrest interview?

18  A.   I, I looked at the criminal complaint.

19  Q.   Okay.  Now specifically with regard to the legal documents

20  or motions that the defendant filed by himself, you referenced

21  that as something you had reviewed, correct?

22  A.   Yes, I briefly reviewed those.

23  Q.   And I think in your evaluation report you referenced these

24  at the bottom of page three, correct?

25  A.   Yes.

```
1   Q.   And that one the things that you reviewed were various

2   motions filed by Jack Carpenter, III dated may 24th to July

3   10th of 2023, correct?

4   A.   Yes.

5   Q.   I'm going to show you what has been marked as government's

6   Exhibit 15.  As you look at that, after you look at that, I'm

7   going to ask you if you recognize those motions?

8   A.   Yes.

9   Q.   And what are those?

10  A.   Those are the motions I referenced earlier of

11  Mr. Carpenter's that I reviewed.

12  Q.   And how did you obtain those motions?

13  A.   Umm, I'm not sure if they were provided by the government

14  or if we went on PACER and found them.  I have a secretary that

15  will sometimes print out these things and put them in the file

16  for my review.

17          MS. CARLSON:  At this time, I'd offer into evidence

18  government's Exhibit # 15.

19          MR. NOGUES:  I'm sorry, your Honor.  One moment.

20          (Pause)

21          MR. NOGUES:  No objection, your Honor.

22          THE COURT:  It's admitted.

23  Q.   (By Ms. Carlson, continuing):  Dr. Nybo, now these legal

24  documents, were these relevant in any way to your findings and

25  your opinion in this case?
```

1    A.   I looked at them as well as the other information as well.

2    So they had less of an impact on my findings in here because

3    they were, really talked with a lot of legalese.  He does

4    mention conspiracy, crimes against humanity, those types of

5    things, but I think it just goes to show his state of mind that

6    he's writing briefs, he has an attorney, but he's doing this

7    anyway, he feels compelled to do this.  So for me that was more

8    helpful than anything, just kind of seeing where he was at,

9    that this is a person that's still filing these regardless of

10   having a counsel that usually would do something like this for

11   him.

12   Q.   And one of the other documents that you said you reviewed

13   was the United States' supplemental exhibits regarding

14   psychiatric or psychological examination?

15   A.   Yes.

16   Q.   And that was a filing made by the government in this case,

17   correct?

18   A.   Yes.

19   Q.   I'm going to show you what's been marked as government's

20   Exhibit # 16.  Is that the document that you reviewed?

21   A.   Yes.

22   Q.   And what does that consist of?

23   A.   This consists of a lot of tweets made by Mr. Carpenter

24   around the time of his pending arrest.

25   Q.   Does it also contain a document called the, umm -- I'm

1    blanking.

2    A.   Yes, there's a declaration of sovereignty --

3    Q.   Declaration of sovereignty?

4    A.   Yes.

5         MS. CARLSON:  Okay.  At this time I'd offer into

6    evidence government's 16.

7         MR. NOGUES:  No objection, your Honor.

8         THE COURT:  It's admitted.

9    Q.   (By Ms. Carlson, continuing):  And how was this document

10   relevant to your evaluation process?

11   A.   I think it was convergent evidence for me.  A lot of the

12   stuff that Mr. Carpenter discussed in our, that one long

13   meeting was similar sentiments that he discussed in these

14   tweets and these different things that there was this

15   conspiracy against him, he was being targeted by several

16   entities, umm.

17   Q.   So let's talk a little bit more about your face-to-face

18   meetings with him and the kinds of things that he spent talking

19   to you about, okay?

20   A.   Okay.

21   Q.   Now first your report contains a summary of your

22   encounters with the defendant, correct?

23   A.   Yes.

24   Q.   And, umm, that summarized in your report?

25   A.   Yes.

1  Q.   Now specifically with regard to employment history, did he

2  provide you any information about his prior employment history?

3  A.   He discussed with me that he was, I think he worked at a

4  restaurant at some point and then he was also a janitor at the

5  University of Michigan and he worked his way up to an IT

6  position.  I think he took maybe classes or whatever at that

7  time, so he really worked his self up from and I think he might

8  have even worked at a medical center or something doing some

9  kind of work there and worked his way into kind of prestigious

10  role in their IT department.

11  Q.   And what happened to that job?

12  A.   Well, when the pandemic emerged and there was a vaccine

13  mandate, Mr. Carpenter did not want to take that, take the

14  vaccine and eventually lost his job with the university and

15  described to me that, you know, at that point his life had

16  spiraled out of control, that he really loved this job in IT

17  and he was good at it.  He had beliefs about the vaccine and

18  didn't want to take them and then he lost his job.

19  Q.   And did the defendant characterize that moment, the event

20  of losing his job and his life spiraling out of control, is

21  that significant to you in any way related to your diagnosis?

22  A.   Yes.  Unfortunately with delusional disorder, it's a rare

23  diagnosis, the prevalence of anyway, but it usually has an

24  onset for those in middle age, right?  It's not the typical

25  onset like a schizophrenia would come on early in adulthood.

1  This emerges later and it's usually there's a stressful event

2  that usually triggers this, the emergence of this delusional

3  disorder and in this case I believe that this, the pandemic and

4  the vaccine mandate and losing his job all contributed to the

5  development of this delusional disorder.

6  Q.   So now I'm going to ask you some of the questions that you

7  characterize as the defendant's delusions.  What were various

8  topics of conversation during that evaluation interview you had

9  with the defendant?

10  A.   He discussed to me that, umm, he had started researching

11  about the vaccine, its efficacy, if it was safe or not and

12  found and was doing on line various posts and things and he

13  found that through his research that the Pfizer which was a,

14  the makers of the vaccine was, had ties with the Israeli

15  government and that the Israeli government then had infiltrated

16  the United States government as well so there was this

17  corruption that was occurring and he's delve deeper into this

18  and he was trying to bring attention to this matter, that this

19  was going on, he had discovered it, it was upsetting to him

20  that he had, umm, become a target of Pfizer with their vast

21  resources.  So they --

22  Q.   Let me stop you there.  When you said that he, he was kind

23  of trying to shed light on what he had discovered?

24  A.   Yes.

25  Q.   And did he tell you how he was trying to do that?

1    A.   Yeah.  He was going on various online forums.  I think

2    there was some QAnon forums that he was posting on, those types

3    of things, I think mostly through kind of social media was

4    trying to shed light on this and had somehow became a target in

5    that and Pfizer wanted to keep him quiet.

6    Q.   And you mentioned that the defendant had some activity on

7    QAnon websites or forums?

8    A.   That's what he reported, yes.

9    Q.   And what did he say regarding these QAnon websites?

10            MR. NOGUES:  I'm sorry, your Honor.  I didn't hear

11   the response to that question.

12            THE WITNESS:  Yes, he did.

13   Q.   (By Ms. Carlson, continuing):  And what did the defendant

14   say regarding these QAnon websites or website that he was on?

15   A.   Well, he's got advanced IT skills so he was examining some

16   of the source code of those websites and discovered that the

17   Internet protocol or the IP address was really associated with

18   the United States State Department.

19   Q.   And so what did lead him to believe?

20   A.   That he believed that this was not an actual QAnon

21   website, but it was actually sponsored by the United States

22   State Department, that he looked further and discovered that

23   there was some embedded links in these that if he were to click

24   on this innocuous link, it would lead to a suicide prevention

25   hotline and that that could be traced to him to suggest somehow

1   he was suicidal or mentally ill.  Umm --

2   Q.  So this belief the defendant had about this QAnon website,

3   was it specifically about umm or in general this website?

4   A.  He believed he was specifically being targeted by this

5   website.  Also, there were some posts on there that made the

6   suggestions that he had an interest in child pornography or was

7   a pedophile.  So what he thought was is that there was this

8   plan or plot that to get him to click on this link to do this

9   kind of character assassination and then if he wound up dead,

10  it would look like a suicide attempt.

11  Q.  A suicide attempt by a pedophile?

12  A.  Yes.

13  Q.  But his belief was that if he ended up dead, it would be

14  because of what?

15  A.  It would be at the hands of Pfizer or the Israeli

16  government or some proxy of them.

17  Q.  Now did the defendant's discovery of this plot that he

18  believed existed prompt him to take any action?

19  A.  He discussed with me that it was very unsettling for him

20  and he became really scared and he left town, fled town and

21  wanted to get out of there.  He went on this then odyssey, a

22  month and-a-half long odyssey throughout the United States

23  hiding, trying to keep safe.

24  Q.  And how was he hiding and trying to keep safe?

25  A.  Well, he discussed how he would go to, he always kept

```
1    moving so he'd go to campsites, sleep in his car, stay for a

2    couple days, move on to the next one.  He would take his, the

3    battery out of his telephone so they couldn't track him via his

4    cellphone.

5    Q.   And who did the defendant believe was coming after him?

6    A.   He believes Pfizer, the Israeli government, the United

7    States government that have been infiltrated by the Israelis.

8    Q.   Now are you aware that in this case the defendant is

9    accused of making a threat of violence against Jewish members

10   of the Michigan government?

11   A.   Yes.

12   Q.   And based on your discussions with the defendant and your

13   review of documents, how did the defendant's delusions that

14   you've just described relate to the crime with which he's being

15   charged?

16   A.   He believes that if he was to make these threats, that

17   that would bring further attention to his cause of trying to

18   expose Pfizer in this matter.  He also believed that they were

19   somehow maybe involved, but there was no, I don't believe

20   there's any specific target or maybe there were specific

21   individuals mentioned in there, but mainly it was to draw

22   attention to, umm, that he was being threatened, that his life

23   was in danger, it was at the hands of these people and wanted

24   to bring awareness to that.

25   Q.   Now had -- did the defendant identify besides Pfizer and
```

1    the U.S. and Israeli governments, was anyone else involved in

2    this plot against him?

3    A.   Some of the tweets suggested he believed that the CIA had

4    either employed or paid a girlfriend and a wife to intervene,

5    drive him crazy, make him look, you know, insane.  He also

6    believed that at some point law enforcement had, was after him,

7    county sheriffs, Michigan State Police had wanted to kill him

8    as well so he was very paranoid during this time heading back

9    as he head back to Michigan.

10   Q.   Did he -- and how did he reference himself in the tweets

11   that you reviewed?

12   A.   He referenced himself as I believe they were, called

13   himself the king of Israel at some point.  I'm not recalling

14   some of the other words, a god of gods, a king of kings, very

15   kind of grandiose language that he'd use.

16   Q.   So after your face-to-face time with the defendant and

17   various supplemental sources that you reviewed, did you arrive

18   at a diagnosis for the defendant?

19   A.   Yes, I did.

20   Q.   And specifically, what was that diagnosis?

21   A.   I diagnosed him with delusional disorder, grandiose and

22   persecutory types.

23   Q.   Now what are the characteristics of delusional disorder?

24   A.   So delusional disorder, the essential feature is that

25   person has to have one or more delusions, so a delusion is a

1    fixed, false belief that the person holds despite evidence to

2    the contrary.  Umm --

3    Q.  And did you find that the defendant has more than one

4    delusion?

5    A.  He has, he has this complexed delusional system.  He

6    believes, the overarching is that Pfizer is after him and it's

7    a conspiracy against him to have him, umm, to kill him.

8    Q.  And said that a delusion is a fixed false belief and I'm

9    sorry, I didn't catch the end of your answer?

10   A.  It's held despite disconfirming evidence, so these people

11   hold tenaciously to these beliefs and it's hard to get them off

12   of them.  There's an energy that they have with them and it's,

13   really it's a misperception of reality based upon what could be

14   real events.

15   Q.  And what does someone with delusional disorder typically

16   present like?

17   A.  They can present as a normal.  They can seem, some of them

18   can hold down jobs.  They don't speak in a disorganized manner.

19   They're not observed hallucinating, those types of things until

20   you start to talk about their delusional beliefs and they feel

21   compelled to talk about them and there's a lot of energy around

22   those beliefs.  So they look normal until you discuss those

23   beliefs.

24   Q.  And do people with a delusional disorder tend to act on

25   their beliefs?

```
1    A.   That's hard to say.  I think there are a lot of people out
2    there that don't act on their beliefs.  I think that they're,
3    it speaks to the intensity that they feel compelled.  Certainly
4    in this matter Mr. Carpenter felt compelled to act on these
5    beliefs that he was being targeted despite knowing that it
6    might land him in jail.  He was a person that really had a
7    limited the criminal history of none at all.  He was an IT
8    professional, he had a good career and it all fell apart and
9    now he finds himself in custody looking at significant charges,
10   umm.
11   Q.   Now you had identified in your diagnosis two types of I
12   guess delusions; grandiose and persecutory.  Is that correct?
13   A.   Yes.
14   Q.   And can you describe for the Court what a grandiose
15   delusion is?
16   A.   So that's where there's, they have a person who is
17   believes he has great talent, insight.  They have special
18   powers, those types of things.  I think had mentioned that he
19   was the king of Israel, that he was a god of gods, divine
20   being, those types of things.
21   Q.   And that's what you base your grandiose delusional
22   diagnosis on?
23   A.   Yes, some of his writings.
24   Q.   And how about the persecutory type?  What does that mean?
25   A.   And that's the prominent one for Mr. Carpenter.  That's
```

1    the belief that he's being conspired against, harassed,

2    followed, poisoned, drugged, not necessarily him, but those,

3    the overarching features of that disorder.

4    Q.   Now are you aware that I guess in this world that there

5    are factions of individuals who subscribe to conspiracy

6    theories regarding COVID and beliefs that the vaccine is not

7    safe and things of that nature?  Are you aware of that general

8    school of thought?

9    A.   Yes.

10   Q.   And does this -- does that -- those beliefs make people

11   necessarily delusional?

12   A.   No.

13   Q.   And so what is the difference between someone who believes

14   that there's conspiracies involved with regard to the COVID

15   vaccine and someone who is delusional?

16   A.   One of the things and they can be a difficult distinction

17   to make because as we talked earlier these delusions or these

18   ideas, they lie on a continuum where you have kind of normal

19   ideas, overvalued ideas, extreme beliefs and then delusional

20   ideas.  So we look at the intensity and if this caused the

21   person disruption and amount of disruption in their life.

22           Another thing that is interesting with individuals

23   with delusions as opposed to those with kind of broader

24   conspiracy theories is that the personalization.  A person with

25   delusional disorder almost always feels that they're the target

1    of the delusion or they're the target of the conspiracy and

2    they're typically and this experience is not necessarily shared

3    by others.

4    Q.   And did you find that in this case with the defendant?

5    A.   Yes.  He believed that these entities were individually

6    acting against him.

7    Q.   Now what is your prognosis of the defendant?  Did you

8    arrive at some opinion on that?

9    A.   Yes.  I believe it's guarded.  I think that delusions can

10   be successfully treated with medication.  What I know about

11   Mr. Carpenter, I don't believe he's interested in taking

12   medication or staying on medication.  I know that he did not

13   show much insight or any insight actually into his delusions so

14   there's -- I don't think he'd find any purpose to take

15   medication in this.  I know that our psychiatrist met with him,

16   also had diagnosed him with a delusional disorder, but no

17   medication was prescribed and Mr. Carpenter was not interested

18   in medication.

19   Q.   Now previously you stated that you came to some opinions

20   in this case and one was that the defendant lacked the ability

21   to rational understand -- rationally understand the nature and

22   consequences of the proceeding against him or that this ability

23   was impaired, correct?

24   A.   Yes.

25   Q.   Now with regard to his understanding of the nature and

1    consequences of the proceeding, did you explore whether he had

2    a factual understanding of the proceedings?

3    A.   Now Mr. Carpenter did not participate in that final

4    interview where I'm really able to dig into this so this is

5    based upon my observations of him, our discussions during that

6    two-hour interview, reviewing some of his letters and his

7    motions and those types of things.  So from that information it

8    does seem like he has a factual understanding.  He understands

9    the roles of the courtroom participants.  He understands the

10   role of the judge.  He's written many motions and letters to

11   the judge.  He understands what the prosecutor's role is as

12   well as his defense counsel's role is.

13   Q.   Despite having this factual understanding, you found that

14   his rational understanding of the nature and consequences of

15   the proceeding against him was impaired?

16   A.   Yes.

17   Q.   And what did you mean by that?

18   A.   So while he understands he's charged with making a threat,

19   threatening comments, it's interstate threatening

20   communications, he asserted that he had the right to do so.  I

21   believed that if someone made a threat against him, he had the

22   lawful right to make a threat back and that he, and any jury

23   once he was able to expose this corruption on the behalf of

24   Pfizer and the Israeli government, they would exonerate him and

25   that he wouldn't really face any consequences to it.  So, you

1   know, his ability to develop a defense that's based on

2   rationality and not delusions is not there.

3   Q.   And does he view, other than it just being a prosecution

4   of him for making this threat, does he view this court case in

5   the context of his efforts to expose the COVID vaccine?

6   A.   One statement he made to me is that he knew the risk what

7   happened, but he felt compelled to expose this plot and to use

8   it as a vehicle than to shed further light on Pfizer and their

9   illegal actions from his perspective.

10  Q.   And that means through this prosecution?

11  A.   Yes.

12  Q.   He's trying to do that?

13  A.   Yes.

14  Q.   You also testified earlier that you came to the opinion

15  that his ability to assist in his defense was impaired,

16  correct?

17  A.   Yes.

18  Q.   And what did you mean by that?

19  A.   Well, again to rationally assist counsel as we looked

20  earlier, I believe that if defense counsel does not go along

21  with his delusional beliefs or his ideas of a defense strategy

22  that involves lawful violence or, you know, that he had the

23  right to make these threats, then I think he'll fire whatever

24  attorney he's being represented by and I think eventually, he

25  likely have to represent himself.

1    Q.   And so how is the defendant wanting to pursue one defense

2    strategy different from any other defendant who has conflict

3    with his attorney based on a difference of how that case should

4    be handled?

5    A.   Yes.   I evaluate a lot of defendants who have conflicts

6    with their attorney and that's one of the reasons why they're

7    sent to us for evaluation.   Sometimes attorneys will say

8    obviously if he's not agreeing with me, there must be something

9    mentally ill about him.   He's being obstinate.   I think you

10   even have several cases out of, at least one out of this

11   district where I evaluated a defendant who presented like that

12   and had went through several attorneys and wanted to file

13   motion after motion after motion and was sent to us, but the

14   differentiation is is whether that person's suffering from a

15   mental illness such as a delusional disorder or not and those

16   other cases I didn't diagnose them with a mental illness, so he

17   obviously he wouldn't meet the criteria for a finding of

18   incompetence 'cause that requires the diagnosis of the severe

19   mental disease or defect.

20   Q.   And how does that defect, so the mental disease or defect

21   is delusional disorder, correct?

22   A.   In this case, yes.

23   Q.   How does that diagnosis affect his ability to rationally

24   consult with counsel?

25   A.   Well, if a person is developing rational strategies for

1    trial whether to decide should I go to trial or should I know,

2    working with your attorney or not, taking a plea deal or not

3    based on rational evidence, not saying I want to go to trial or

4    I want to push through this defense that's based on delusions.

5    Q.   So what is your recommendation as to this defendant?

6    A.   I recommended that he undergo competency restoration

7    procedures.

8    Q.   And how would that benefit the defendant?

9    A.   It would allow for further observations of Mr. Carpenter

10   at a medical center and access to not only psychologists, but

11   psychiatrists and treatment then of delusional disorder is

12   medication.  So I believe that once there, they can assess him

13   further, decide if he needs medication, would benefit from

14   medication and restore him to competence so he can rationally

15   assist in his defense.

16   Q.   And is medication generally effective with delusional

17   disorder?

18   A.   I don't know the exact statistics, but certainly

19   anecdotally I've seen that they were able to restore

20   individuals to competency with medication with this disorder.

21           MS. CARLSON:  I have no further questions.

22           THE COURT:  All right.  You want to ask some

23   questions, counsel?

24           MR. NOGUES:  Yes, your Honor, thank you.

25                    CROSS-EXAMINATION

1    BY MR. NOGUES:

2    Q.   So Dr. Nybo, you said that in the typical competency

3    evaluation, there's a number of steps or number of pieces of it

4    that you would rely upon to make your final conclusion and

5    opinion, correct?

6    A.   That's correct.

7    Q.   One of them is the clinical interview, correct?

8    A.   That's correct.

9    Q.   Any relevant testing that you said in order to diagnose

10   particular illnesses or particular conditions?

11   A.   Yes.

12   Q.   And then a review of records legal and otherwise, right?

13   A.   That's correct.

14   Q.   And then you mentioned that there's a tool that you can

15   use, the revised competency assessment instrument?

16   A.   That's correct.

17   Q.   And that tool is an important part of that evaluation,

18   correct?

19   A.   It certainly can be, yes.

20   Q.   In this case you were unable to implement that tool with

21   Mr. Carpenter, correct?

22   A.   That's correct.

23   Q.   And is it fair to say that you did not, you were not able

24   to conduct all the clinical interviews with Mr. Carpenter that

25   would have liked to do to do a full assessment?

1    A.   That's correct.

2    Q.   And there was no relevant testing that was done in

3    Mr. Carpenter's case?

4    A.   That's correct.

5    Q.   So you're here to give an opinion on his competency, but

6    in this particular case that's based on much less of the

7    information and tools that you normally would rely upon in your

8    long career now as a forensic evaluator?

9    A.   Yes, I had to rely on less information on this one.

10   Q.   Part of that, umm, as the records aspect, part of that is

11   looking at a person's prior medical records and diagnoses,

12   correct?

13   A.   That's correct.

14   Q.   And I believe you said that you were able to determine

15   that my client had no history of psychological diagnoses?

16   A.   That's what he reported to our medical staff yes.

17   Q.   But you also were not able to find any?

18   A.   I couldn't find any.

19   Q.   Okay, and you mentioned that one of the characteristics of

20   delusional disorder is that it can come on, the onset could be

21   at middle age, right?

22   A.   Yes.

23   Q.   So somebody might not have actually had any psychological

24   history before for you to still feel that they might have this

25   disorder?

```
 1    A.   Right, it might be a first episode.
 2    Q.   So there wouldn't necessarily be a difference in looking
 3    at the history of some somebody who has a delusional disorder
 4    or doesn't have a delusional disorder and also doesn't have any
 5    other diagnoses.  They might have the same psychological
 6    medical history, right?
 7    A.   That's possible.
 8    Q.   Yeah.  At the beginning of your direct examination, you
 9    mentioned the salience of the, umm, that particular seminar on
10    distinguishing delusions from other types of conspiracy
11    theories, right?
12    A.   Yes.
13    Q.   And you said salient in the world these days or something
14    to that effect?
15    A.   Yes.
16    Q.   Is it fair to say that Mr. Carpenter is not the first
17    patient at Sea Tac that you have evaluated who has held some of
18    those beliefs?
19    A.   That's correct.
20    Q.   And one of the points that you made on direct was that in
21    your expert opinion there's a difference between broad
22    conspiracy theories and individualized, beliefs that there's an
23    individualized conspiracy against that person?
24    A.   Yes.
25    Q.   And it's your testimony that my client expressed concerns
```

1    that there were conspiracies against him individually?

2    A.   That's correct.

3    Q.   And this may sound like a silly question to you, but would

4    you be able to tell the difference between somebody who there

5    actually was a conspiracy against them that they had detected

6    and somebody who had a delusional belief in such a conspiracy?

7    A.   I think that based upon the evidence, I could probably

8    pick it out.  A lot of people believe these are real, umm, that

9    they're really being targeted and you know what, the fact of

10   the matter is some people are targeted in life, you know, and

11   then sometimes that's where that gray area can be.

12   Q.   Right.  You mentioned that during Mr. Carpenter's stay at

13   your facility, that he had access to e-mail communication.

14   A.   Yes.

15   Q.   And I believe it's your testimony that you received very

16   frequent e-mail communications from my client?

17   A.   Yes.

18   Q.   Were those direct communications to you or were they

19   forwarded to you from other staff members?

20   A.   They were, umm, forwarded to me.  There's a, a centralized

21   psychology box so they don't have a direct access to my e-mail,

22   they send them to a set psychology box.  Our chief psychologist

23   then will forward those to whoever they're directed to.  It's

24   like a centralized box.

25   Q.   So in your testimony and in your report when you said that

```
1    you received daily e-mail correspondence from my client,
2    actually those e-mails weren't sent to you personally or
3    directly, correct?
4    A.   No, but he put Dr. Nybo on them so I figured they were
5    towards me.  I just assumed that.
6    Q.   They were Dr. Nybo?  They were all addressed to you?
7    A.   I believe they were, many of them.  I don't know if they
8    all were addressed to me or not.
9    Q.   And was that in fact on a daily basis or is that not
10   accurate?
11   A.   Well, I believe they were.  They seemed to be on a daily
12   basis when he was there, I was getting these forwards.  No, I
13   didn't manage that psych box, that is psychology e-mail box.
14   Q.   One of the issues that you mentioned was that
15   Mr. Carpenter had expressed concern with the messaging in COVID
16   vaccine posters that were posted at the facility, correct?
17   A.   Yes.
18   Q.   And I think specifically you said that he objected to the
19   words safe and effective?
20   A.   Yes.
21   Q.   Are you aware if those posters ended up getting taken down
22   from the facility?
23   A.   I don't know to be quite honest.  I wasn't in charge of
24   taking those down and I know they were going to try to take
25   them down, but --
```

1  Q.  I'm sorry, I just wanted -- my question was were you aware

2  of whether or not they were taken down?

3  A.  I was not aware if they were taken down or not.

4  Q.  Okay.  Yo noted in your report and in your testimony that

5  one of the things that Mr. Carpenter said to you is that he

6  believed there was some sort of appeal process that should

7  preempt the competency valuation, correct?

8  A.  Yes.

9  Q.  And you cited that as pieces, part of your evidence of

10  delusions that he was suffering, correct?

11  A.  I don't know if I, I'm sorry if I mischaracterized it.  I

12  didn't mean to say that because he thought it was an appeal,

13  that that was a delusion, but he did believe there was an

14  appeal and it possibly could be part of a delusion.  I'm not

15  sure of that.  There could have been actually an appeal

16  ongoing.

17  Q.  And so hypothetically if there was an appeal going, you

18  would recognize that that in fact was not a delusion, correct?

19  A.  That's correct.

20  Q.  Okay and is it fair to say then that given your limited

21  ability to interact with my client or to go through his

22  records, that there may have been other beliefs that he

23  expressed to you that you may have thought were delusions, but

24  may in fact had some factual basis in them?

25  A.  I mean, it's always possible.

```
 1    Q.   And you're not a lawyer obviously, right?  You're a

 2    psychologist.  The packet of documents that you reviewed as

 3    part of your evaluation that was marked as government's Exhibit

 4    15, you referred to that as motions, correct.

 5    A.   Yes.

 6    Q.   Okay.  Do you have a definite understanding of what might

 7    be a motion versus a letter?

 8    A.   No, I don't know what these are to be quite honest with

 9    you.

10    Q.   Okay, so to characterize them as motions might have been

11    inaccurate or perhaps too much of a conclusion to make?

12    A.   Possibly, yes.

13    Q.   Okay, but that something that you did include in your

14    report?

15    A.   Yes.

16    Q.   So there are things in your record regarding the way the

17    e-mails were communicated, the nature of documents that you

18    reviewed that you acknowledge may not be fully accurate?

19    A.   That's possible.

20    Q.   Okay.  You mentioned that it is your expert opinion that

21    Mr. Carpenter has a complex delusional system, correct?

22    A.   Yes.

23    Q.   And that this complex delusional system related in part to

24    the COVID pandemic and in part to the distribution of the

25    vaccine by Pfizer, correct?
```

```
1   A.   Yes.

2   Q.   And the potential involvement of various governments in

3   that process?

4   A.   Yes.

5   Q.   And that you concluded that he delusionally believed that

6   it was that conspiracy that compelled him to take the actions

7   that he did?

8   A.   Yes.  My understanding was that he felt threatened and he

9   acted out on that.

10  Q.   And it's your expert opinion based on the information

11  available to you that that was in effect a delusion?

12  A.   Yes.

13  Q.   But you, it sounds like you're saying that you do believe

14  that it was a genuine, sincere belief?

15  A.   He does believe that he was targeted.

16  Q.   He does believe it now?

17  A.   I don't know now.  I'd --

18  Q.   Believed it at the time that you interviewed him?

19  A.   Yes.

20  Q.   Which was in August I think you said?

21  A.   Yes.

22  Q.   And based on your evaluation, it's also your assessment

23  that he truly and sincerely believed those things at the time

24  of the alleged offenses?

25  A.   Yes.
```

1  Q.  And again you said that he genuinely and sincerely

2  believed that he was being threatened and targeted?

3  A.  Yes.

4  Q.  And that his actions were designed to protect himself and

5  to expose that conspiracy against him?

6  A.  Yes.

7  Q.  And he genuinely and sincerely believed that his actions

8  were lawful?

9  A.  Yes.

10 Q.  Okay.  Now a part of your job as a forensic psychologist

11 at the federal unit is that you got only give evaluations on

12 legal competency at the time of trial, but you also do criminal

13 responsibility evaluations, correct?

14 A.  Yes.

15 Q.  You were not asked or ordered to do one of those

16 evaluations in this case?

17 A.  No.

18 Q.  One of the central questions in that type of evaluation is

19 whether or not the individual at the time of the offense had an

20 understanding of the rightness or wrongness of their actions,

21 right?

22 A.  Yes.

23 Q.  And it's your opinion, your expert opinion that my client

24 did not have, umm, that he had the delusional belief in the

25 correctness of his actions at the time of the alleged offenses?

1   A.   He believed he was protecting himself in trying to expose

2   a plot, yes.

3   Q.   Yes.  I might have heard you wrong, but did you say that

4   the desire for a defendant to want to represent themselves was

5   delusional?

6   A.   No, I did not say that.

7   Q.   Okay, then maybe I'll give you a chance to clarify what

8   you meant by that.

9   A.   What I meant by that is that individuals with delusional

10  disorder are really compelled by their delusional beliefs and

11  they believe they're right and correct and they won't consider

12  alternate opinions, so my opinion was that it would be very

13  hard for a counsel to work with Mr. Carpenter if they didn't go

14  along with his delusional beliefs or his beliefs that, umm, to

15  institute a defense, that his actions were lawful or they were

16  just in that manner and I opined that it is possible that if

17  attorneys wouldn't do that, he would fire them and he would be

18  left to represent himself.  Now I don't know if that's going to

19  happen or not in this case, but --

20  Q.   Umm, and again one of the viewpoints that he expressed to

21  you was the idea that his actions were taken in some degree in

22  self-defense, right?

23  A.   Yes, he believed his life was being threatened.

24  Q.   And again you are not a lawyer, but I'm sure you have

25  heard the testimony self-defense before?

1    A.   Yes.

2    Q.   And you're aware that that can be a legal theory, correct?

3    A.   I am aware, yes.

4    Q.   Okay, but since you're not a lawyer you're not able to

5    give an expert opinion about the validity of a self-defense

6    theory in this particular case?

7    A.   No.

8    Q.   So you are not in a position to say that certain defenses

9    that Mr. Carpenter or his lawyer might take up may or may not

10   have legal merit?

11   A.   That's true.  I'm not a lawyer and I'm not a defense

12   counsel.

13   Q.   Now Ms. Carlson asked you about prognosis and you stated

14   that you, your prognosis was guarded, that was the term that

15   you used.  And what you meant by that was it's a kind of hard

16   to tell what would happen if restoration procedures were

17   started with my client if he was found incompetent?

18   A.   That's correct.

19   Q.   You said that you are not aware of any hard data that the

20   application of medication can relieve a person of the symptoms

21   of delusional disorder that makes them legally incompetent to

22   stand trial?

23   A.   I believe what I said, I'm not aware of the statistics of

24   the top of my head of what percentage are.  I do know that that

25   is the gold standard for treatment of delusional disorder and

1   I've had many individuals undergo competency restoration and be

2   treated successfully with medications.

3   Q.  Well, correct me if I'm wrong, but actually what you said

4   on direct was anecdotally you had heard that?

5   A.  Yes.

6   Q.  Okay, so it's not something that you've seen studies on?

7   A.  I have not seen any studies, yes, that's correct.

8   Q.  All right and if it's anecdotal, you haven't seen it

9   directly yourself.  You've heard about it from other people?

10   A.  Well, that's true.  I've talked with other forensic

11   psychologists who've had my cases and I asked what happened and

12   they told me.

13   Q.  So in your qualification as an expert in the field and the

14   science of forensic psychology, you cannot give an opinion

15   based on data or on your own experience on whether or not

16   medication would actually serve any ability to restore my

17   client if in fact he was found incompetent?

18   A.  No, I don't do restorations and I'm not a psychiatrist.

19   Q.  And actually that's an important point that I didn't even

20   think of, but one the distinctions between a psychiatrist and a

21   psychologist is that a psychiatrist is a medical doctor who

22   actually is able to prescribe medications, correct?

23   A.  That's correct.

24   Q.  Okay and as a psychologist, you have a PhD.  You're a

25   doctor of philosophy in psychology, but you're not a medical

1    doctor?

2    A.   That's correct.

3    Q.   Okay and so the application of medications to somebody's

4    psychological wellbeing is not your area of expertise?

5    A.   No.

6    Q.   Okay and hypothetically if my client were legally

7    incompetent right now and he were subjected to restoration

8    procedures that were able to render him competent to stand

9    trial now, that would not impact whether or not he understood

10   the difference between right and wrong at the time of the

11   alleged offense?

12   A.   Those are two separate questions.

13   Q.   And again along the same lines there, I just want to make

14   sure I got this right.  You stated that Mr., it was your

15   opinion that Mr. Carpenter, the quote I wrote was "felt

16   compelled" to act and the way he did at the time of the alleged

17   offenses, correct?

18   A.   Yes.

19   Q.   Okay.  So it's your characterization, your expert

20   characterization that he felt like he had no choice?

21   A.   That's what he discussed with me during this interview.

22   Q.   And you, your conclusion is that you believe that that was

23   a sincere --

24   A.   I believe that he truly believed that this was happening

25   to him, yes.

1          MR. NOGUES:  No further questions.

2          THE COURT:  Any redirect?

3          MS. CARLSON:  Yes, your Honor.

4                    REDIRECT EXAMINATION

5    BY MS. CARLSON:

6    Q.  Dr. Nybo, you were not asked by this Court to evaluate the

7    defendant for criminal responsibility, correct?

8    A.  That's correct.

9    Q.  And when Mr. Nogues just asked you about whether your

10   expert opinion is that the defendant felt compelled, was your

11   answer based on what the defendant reported to you or do you

12   have an opinion on that?

13   A.  That's what he reported to me, he felt like he needed to

14   do something.

15   Q.  And so today during your testimony, actually do you have

16   any opinion on whether the defendant was criminally responsible

17   at the time of the offense?

18   A.  No, that's a whole other evaluation procedures and, umm,

19   that would have to be ordered separately.

20   Q.  And you indicated that you do not do restoration

21   proceedings, correct?

22   A.  That's correct.

23   Q.  And your recommendation is that he be referred for

24   restoration proceedings, correct?

25   A.  That's correct.

1  Q.  And I think when you testified on direct, you said that

2  that would allow for an additional period of study?

3  A.  Yes.

4  Q.  And are you, I know you don't do restoration proceedings,

5  but are you aware that an additional period of study would

6  allow an evaluator to come to the conclusion as to whether

7  there's a substantial probability that the defendant could be

8  restored in the foreseeable future?

9  A.  Yes.

10 Q.  And right now that determination has not been made?

11 A.  That's correct.

12 Q.  And is that one of the purposes of participating in a

13 restoration program?

14 A.  Yes.

15 Q.  Now with regard to the defendant's refusal to fully

16 participate in the competency evaluation, we talked about the

17 fact that the defendant said that he had an appeal pending

18 regarding the evaluation order.  Do you remember that?

19 A.  Yes.

20 Q.  And is your opinion as to his competency so to stand trial

21 based on -- do you believe that that's a delusion?  Did that

22 play a part in your opinion or diagnosis?

23 A.  No, it didn't.  It was just he expressed concerns about

24 this evaluation from day one.  It didn't necessarily figure

25 into my opinion.  More weight was put on what he discussed with

1  me during those interviews and some of the record that I

2  reviewed.

3  Q.   Okay and you were asked on cross-examination whether the

4  defendant was not the first patient you've seen that holds

5  similar beliefs, correct?

6  A.   That's correct.

7  Q.   And it wasn't very specific, but have you seen other

8  patients who have held similar beliefs regarding the COVID

9  vaccine and whether it was safe and effective?

10  A.   I don't specifically recall the safe and effective part,

11  but there's been individuals who believe that they shouldn't be

12  forced by the government to take something that they didn't

13  want to take.

14  Q.   Have you ever had a defendant who believed that the maker

15  the COVID vaccine, Pfizer, was individually targeting them?

16  A.   No, I've not had that before.

17  Q.   Have you ever seen a patient where they believed that the

18  Israeli government was directly targeting them?

19  A.   No.

20  Q.   Have you ever see a patient where they believed that the

21  U.S. government was directly and individually targeting them?

22  A.   No.

23  Q.   Now you were also asked about relevant testing.  Do you

24  remember that?

25  A.   Yes.

1   Q.   And a during court-ordered competency evaluation, do you

2   typically employee a number of psychological testing?

3   A.   It depends on the person, they're referral question, yes.

4   Q.   And in a case where you are asked to render an opinion on

5   competency to stand trial, okay, in this case, would you have

6   employed some psychological testing?

7   A.   If he would have agreed to, I would have.  I always try to

8   administer at least one objective standardized instrument,

9   probably a personality inventory.

10  Q.   And how would -- I'm sorry, what test did you identify?

11  A.   It's typically we use the Minnesota multi-facet

12  personality inventory, the MMPI III.  It's a third addition.

13  It's a very well known standard test that it's employed by

14  psychologists in many different venues.

15  Q.   And one way or the other considering your diagnosis of

16  delusional disorder, how would that test have affected your

17  opinion or could it have affected your opinion?

18  A.   What we look for are convergent sources of data so we

19  don't make a diagnosis just on one specific test alone 'cause

20  they're not that sensitive to one -- it's not like a person

21  would do this test and this is their diagnosis, it just gives

22  personal characteristics.  One of the things I usually do, give

23  that is to tell about if they're exaggerating, if they're not

24  being honest about things, a little bit about their personality

25  style, those types of things.

1    Q.   And in this case you had convergent sources of data other

2    than the psychological testing?

3    A.   Yeah, I didn't conduct any psychological testing so the

4    convergent sources were the documents that were provided to me

5    to review, our medical records as well as the interview with

6    Mr. Carpenter.

7    Q.   And part of those documents included what you termed

8    motions filed by the defendant?

9    A.   Yes.

10   Q.   And whether they were motions or letters, those are all

11   appeared to be in the handwriting of the defendant, correct and

12   signed by the defendant?

13   A.   Yes, it appears to be that way.

14   Q.   Now you were also asked about this RCAI test.  Is that the

15   right acronym?

16   A.   Yes.

17   Q.   And what does that stand for again?

18   A.   A revised competency assessment instrument.

19   Q.   And what does that test, that test allow you to determine?

20   A.   It's not a test as much as an interview and so it just

21   leads me through, it's just a framework for me to ask questions

22   about do you know what the roles of the various court

23   participants are, appraisal available of defenses, what they

24   know about their defense counsel, how they relate to them, if

25   they have confidence in them, what's the evidence against them

1    so it just is a way for me to look at those various areas that

2    are important to competency.

3    Q.  And does that at times could that assist you or provide a,

4    data in order to determine whether someone has a factual

5    understanding of the case?

6    A.  Yes.

7    Q.  How about a rational understanding of the case?

8    A.  With a rational, it's a little bit more difficult because

9    we're looking at is there an influence of a mental disorder at

10   play there and what it might help me do is pull out more like

11   the defense strategy and what they might want to rely on, but

12   Mr. Carpenter did that in that first interview when we, umm,

13   for that two hours.

14   Q.  And you determined in this case despite not being able to

15   ask the questions that are part of an RCAI that he, you felt

16   that he had a factual understanding of the procedures against

17   him?

18   A.  Yes.

19          MS. CARLSON:  Okay.  I have no further questions.

20          THE COURT:  Anything also, Mr. Nogues?

21          MR. NOGUES:  One moment, your Honor.

22          (Pause).

23                        RECROSS-EXAMINATION

24   BY MR. NOGUES:

25   Q.  When you were distinguishing between a conspiracy theory

```
 1   and a delusion, you said it's difficult.  It's a continuum?
 2   A.   Yes.
 3   Q.   One of the things you said is that it can be evaluated in
 4   part by how much disruption it causes in a person's life?
 5   A.   Yes.
 6   Q.   But is it fair to say that a truly traumatic or troubling
 7   or targeted acts in a person's life can disrupt their life even
 8   if they are actually happening.  It doesn't have to be a
 9   delusion for it to be disruptive in their life?
10   A.   Yes.
11   Q.   One of the other things you said was that a delusion is
12   generally something that's held despite disproving evidence.
13   You called it a misperception of reality where somebody holds
14   that belief despite disproving evidence, right?
15   A.   Yes.
16   Q.   It's fair to say that you did not have any access to any
17   evidence disproving the particular theories that Mr. Carpenter
18   had about himself being targeted, right?
19   A.   I didn't have any specific evidence, no.
20   Q.   So that's --
21   A.   That was true --
22   Q.   -- an assumption that you were making?
23   A.   That's an assumption.
24            MR. NOGUES:  Okay.  No further questions.
25            THE COURT:  Ms. Carlson, anything else?
```

```
 1            MS. CARLSON:  No, your Honor.  Thank you.

 2            THE COURT:  Okay.  Are there other witnesses or

 3    evidence you want to put on?

 4            MS. CARLSON:  No, not from the government.

 5            THE COURT:  All right.  You can step town, sir.

 6    Thank you very much.

 7            (Witness excused at 4:05 p.m.)

 8            THE COURT:  Nogues, anything else for the defense?

 9            MR. NOGUES:  One moment, your Honor.

10            (Pause)

11            MR. NOGUES:  Mr. Carpenter will testify, your Honor.

12            THE COURT:  All right.  You can testify from right

13    there.

14            MR. NOGUES:  Would the Court like me to stay here go

15    go to the podium?

16            THE COURT:  You can stay right there.  Both of you

17    can just get in front of the microphone.  There's another

18    microphone on your table and it does move.  We're going to

19    swear him in.

20            THE CLERK OF THE COURT:  Mr. Carpenter, if you can

21    raise your right hand?  Do you solemnly swear or affirm under

22    penalty of perjury the testimony you're about to give in the

23    cause now pending before this Court shall be the truth, the

24    whole truth and nothing but the truth?  If so, state I do.

25            THE DEFENDANT:  I do.
```

```
 1               THE CLERK OF THE COURT:  You can lower your hand.
 2                    J A C K   C A R P E N T E R,
 3   Called as a witness by the Defense at 4:04 p.m. and having been
 4   first duly sworn, testified as follows:
 5                         DIRECT EXAMINATION
 6   BY MR. NOGUES:
 7   Q.   Can you please state your name and spell it for the
 8   record?
 9   A.   Jack Carpenter.  J-a-c-k, C-a-r-p-e-n-t-e-r.
10               THE COURT:  I'm going to have to ask you to keep your
11   voice up, Mr. Carpenter.
12   Q.   (By Mr. Nogues, continuing):  I was even having trouble
13   hearing you from right here so just make sure you speak up.
14   Okay, Mr. Carpenter, do you know why you're here today?
15   A.   Yes.
16   Q.   And why are we here today?
17   A.   Umm, because I'm charged with threats over interstate,
18   interstate communication, interstate commerce.
19   Q.   That's the criminal charges against you, right?
20   A.   Yeah.  Well, today, yeah, we're here for the competency
21   evaluation.
22   Q.   And what is the point of a competency evaluation?
23   A.   Determine whether or not I understand what's going on with
24   the trial and can, umm, rationally assist in my defense.
25   Q.   Have you been able to follow the hearing today?
```

1   A.   Yep.

2   Q.   Okay and have you been talking notes?

3   A.   Yep.

4   Q.   And have you asked me to ask certain questions of the

5   witness?

6   A.   Yes.

7   Q.   You asked me to make certain arguments supporting your

8   position?

9   A.   Yes.

10   Q.   Okay.  What do you see the role of the defense attorney in

11   a criminal case?

12   A.   To present the defense and evidence to support it.

13   Q.   And what do you see as the role of the prosecuting

14   attorneys?

15   A.   To present evidence of, to support their version of the

16   charges and prove guilt or innocence beyond, umm, beyond a

17   reasonable doubt.

18          MR. NOGUES:  Is the court reporter able to hear?

19          MS. CARLSON:  Can you pull the microphone closer to

20   him?

21   Q.   (By Mr. Nogues, continuing):  And what is the role of the

22   judge in a criminal case?

23   A.   To judge the law of the case and make sure that it's

24   followed.

25   Q.   Now you have filed various documents directly with the

```
1    Court, correct?
2    A.   Yep.
3    Q.   Some of those documents were letters, correct?
4    A.   Yes.
5    Q.   Some of those documents were motions?
6    A.   Yes.
7    Q.   Okay and some of those motions were motions to dismiss me
8    as your attorney, correct?
9    A.   Yes, sir.
10   Q.   Okay.  Do you want to give an explanation of why you wish
11   to dismiss me?
12   A.   Well, because in the, on the June 6th hearing we, umm, I
13   discussed with the Court some of the claims that the
14   prosecution had made were delusions including an e-mail that I
15   sent and a phone call that I made to the State Department and
16   the judge recognized it as a defense of challenging
17   jurisdiction and then you waived it and said that it wasn't
18   going to be or it doesn't, umm, impose on my challenge to
19   jurisdiction to go ahead with the competency hearing and then
20   later challenge jurisdiction which if you review the notes from
21   June 6th, it -- I specifically pointed out that if jurisdiction
22   is lacking, then competency is not relevant and in addition to
23   that when I spoke with you after the hearing when I told you
24   that I wanted you to point out that the prosecution can't
25   separate jurisdictional challenge from the competency motion
```

1    because they used the jurisdictional challenge as evidence of

2    incompetency, that you said that you weren't going to do that

3    when we discussed it.  You said that it was because of your

4    personal beliefs when I pointed out that the facts and the law

5    support the defense which you later then sent me a letter

6    saying that that was not the case, that it was because you have

7    taken an oath to not put forth motions and defenses that you

8    believe not to be or not to have merit, to be frivolous as you

9    stated and then you said in your letter that there's a conflict

10   of interest in representing me in my appeal and then you turned

11   around and delayed the appeal until after this hearing.

12   Q.   So you --

13   A.   So that the question of whether or not the Court should

14   have answered the question or responded to the question of

15   jurisdiction before the competency motion before having this

16   hearing here, umm, that point of law was not assessed and I'm

17   certainly correct in that 'cause if the Court doesn't have

18   jurisdiction, then there's no reason for this.

19   Q.   So is it fair to say that you understood my position, but

20   you disagreed with it rationally?

21   A.   Yeah, I disagreed with it and when like I said when we

22   discussed it downstairs, I specifically said the facts support

23   it, the law supports it, that it's not because of the facts or

24   the law that you're not putting the defense, it's your personal

25   beliefs and you said you're absolutely right, but if you fire

1   me it's not going to do you any good, you're going to get

2   assigned another lawyer that's going to do the same thing.

3   Q.   So is it your position that the barrier to you assisting

4   me in the defense of you is not an inability to understand or

5   rationally appreciate what's going on, it is purely a

6   fundamental difference of legal strategy?

7   A.   Umm, I -- yeah, I mean, I guess I can say that, but, umm,

8   when we discussed the defense originally you said you weren't

9   going to present it 'cause the judge wouldn't hear it, then I

10  presented the defense and the judge responded to it and then

11  you waived it, so that's, that's mainly the big, major point.

12  Q.   You were present for the testimony of Dr. Nybo, correct?

13  A.   Yes.

14  Q.   Have you ever been diagnosed with mental illness prior to

15  Dr. Nybo's report?

16  A.   No and the stuff that he's claiming are delusions, there

17  is evidence to support it.  I just did not been able to present

18  that evidence.  For instance, the stuff regarding the Q user?

19  I'm trained in computer forensics.  That was part of my role as

20  an IT staff.  I was in the highest tier of IT for the

21  University of Michigan for five years.  There's probably nobody

22  in this room that has a greater understanding of computer

23  forensics than myself and what I said about that is absolutely

24  accurate.  The code to replicate it is posted on line.  As soon

25  as I posted it on line, Twitter censored my account.

1          MR. NOGUES:  No further questions, your Honor.

2          THE COURT:  Cross-examine?

3          MR. MOON:  Yes, your Honor.  Would you like me to

4   remain at my seat or go to the podium?

5          THE COURT:  I don't have a preference, just as long

6   as you're in front of a microphone.  You can be seated if you

7   like, stand, either way.

8          MR. MOON:  Okay.

9                         CROSS-EXAMINATION

10  BY MR. MOON:

11  Q.  Mr. Carpenter, in February of this year, you use a Twitter

12  account, right?

13  A.  Yep.

14  Q.  And that's the tempered reason account?

15  A.  Yep.

16  Q.  Or at tempered underscore reason?

17  A.  Yes.

18  Q.  And as counsel mentioned, you've filed motions and letters

19  in this case?

20  A.  Yes, I have.

21  Q.  And you stand by what you've written in those motions and

22  letters?

23  A.  Umm, in terms of what?  Like --

24          THE COURT:  Got to get closer to a microphone.

25  Counsel, can you get that closer to Mr. Carpenter?

1         THE WITNESS:  In terms of what?  Be specific about

2    what I'm agreeing to.

3    Q.   (By Mr. Moon, continuing):  You want the Court to consider

4    what you've written?

5    A.   As far as the motions, absolutely and in terms of the

6    challenge to jurisdiction which, you know, 12, Rule 12(b)(1)

7    and 12(b)(2) says that I can present any, umm, any defense to

8    the judge in a motion that the judge has the ability to hear on

9    its merits and rule on and that's, and it's a legal argument.

10   It's, you know, you guys can choose to dismiss it without

11   assessing it all you want, but it's a legal argument and I

12   deserve to have it heard.

13   Q.   And you certainly believe the things that you wrote in

14   your motions and letters, right?

15   A.   Umm, for the, the legal assessment, yes.

16   Q.   Now in February when you were using your Twitter account,

17   you made a series of tweets from Texas, right?

18   A.   Yes.

19   Q.   And in one of those, Exhibit 3, please, Ms. Cook, you said

20   that you were coming back to Michigan, right?

21   A.   Umm, what is the one after it say?

22   Q.   I'll get there.  You made this tweet, didn't you,

23   Mr. Carpenter?

24   A.   I did, yes.

25         MR. MOON:  Your Honor, I'd move to admit government

1    Exhibit 3.

2            MR. NOGUES:  No objection, your Honor.

3            THE COURT:  All right.  Admitted.

4    Q.  (By Mr. Moon, continuing):  And Exhibit 4, please?  You

5    also made the tweets in Exhibit 4 on the screen there in front

6    of you, right?

7    A.  Yeah, I sent the tweets, yes.  I can't claim self-defense,

8    defense of others or the other defense I want to put forward

9    without claiming responsibility for the actions.

10   Q.  Right.  So in this tweet you claim that Jewish public

11   officials conducted an unlawful war of aggression against you,

12   right?

13   A.  Against -- well, yeah, against me and U.S. citizens in

14   general.

15   Q.  For using a biological weapon?

16   A.  Yes.  They released the COVID virus on purpose.  That's

17   part of what the House Intelligence Committee is investigating

18   right now.

19   Q.  And the biological weapon is the COVID virus and COVID-19

20   vaccine?

21   A.  The biological weapon is the COVID-19 virus.  The SARS

22   COV2 is actually what it's called and it was, umm, there's an

23   executive order signed in September of 2019 that Section Four

24   tasks the National Institute of Health with creating a group to

25   figure out a way to quote "manufacture" public demand and

| | |
|---|---|
| 1 | manufacture public funding of new vaccine technologies |
| 2 | including self-therapy which is MRNA and then shortly after |
| 3 | that a group named Ecoalliance Health which is associated with |
| 4 | Dr. Fauci approached DARPA and asked for funding to release a |
| 5 | human-modified corona virus into the bat population in China. |
| 6 | Dr. Fauci testified in front of the Senate in regards to this |
| 7 | where claimed that he didn't violate treaties against |
| 8 | manufacturing biological weapons because they, the definition |
| 9 | of gain of function research is, umm, to take a virus that is |
| 10 | already able to infect humans and make it more infectious or |
| 11 | more deadly, but instead what they were paying for was that |
| 12 | they took a virus that was unable to infect humans and made it |
| 13 | able to infect humans which made it deadly, so therefore it |
| 14 | didn't qualify under that definition. |
| 15 | Q.  So to my question, the biological weapon was the COVID |
| 16 | virus? |
| 17 | A.  Yes. |
| 18 | MR. MOON:  I'd like to offer Exhibit 4, your Honor. |
| 19 | MR. NOGUES:  No objection, your Honor. |
| 20 | THE COURT:  Admitted. |
| 21 | MR. MOON:  And Exhibit 5, please, Ms. Cook. |
| 22 | Q.  (By Mr. Moon, continuing):  You then threatened to carry |
| 23 | out the punishment of death to anyone that is Jewish in the |
| 24 | Michigan government, right? |
| 25 | A.  I sent that tweet, yes. |

1          MR. MOON:  Your Honor, I offer government Exhibit 5.

2          MR. NOGUES:  No objection.

3          THE COURT:  That's admitted.

4          MR. MOON:  And government Exhibit 6, please?

5     Q.   (By Mr. Moon, continuing):  Finally Mr. Carpenter, you

6     tweeted that anyone who tried to stop you would be met with

7     deadly force in self-defense.  Is that right?

8     A.   I tweeted it, yep.

9          MR. MOON:  Your Honor, I offer government Exhibit 6.

10         MR. NOGUES:  No objection.

11         THE COURT:  That's admitted.

12    Q.   (By Mr. Moon, continuing):  Now Mr. Carpenter, were you

13    fired from the University of Michigan because you refused the

14    COVID vaccine, right?

15    A.   I refused the COVID injections.  They changed the

16    definition of vaccine to remove the word immunity.  They

17    offered no immunity.

18    Q.   You were fired for refusing the COVID injections then?

19    A.   (Nodding)

20         THE COURT:  Is that yes?

21         THE WITNESS:  Yes.

22    Q.   (By Mr. Moon, continuing):  You then filed lawsuits

23    against the school?

24    A.   No.  I spent 11 months arguing with the 15th District

25    Court about the rules in regarding private prosecutions and

1    initiated the first private prosecution in over 100 years where

2    I won five arguments that went up to the Supreme Court Office

3    of Administration to direct the Court in how to respond.

4    Q.   And you remained fired after that 11 months?

5    A.   Well, I was trying to charge them criminally, but the

6    judge in that case ruled that even though he was aware that the

7    injections were experimental as per definition in law, that it

8    was just a matter of policy to prevent people from accessing

9    the public trust if they refused to take them.

10   Q.   Now in this case you've written to the Court that the

11   COVID-19 scam in your words was supposed to go on until 2024?

12   A.   Yes, October, 2024.  That's listed in the emergency

13   declaration.

14   Q.   But the Secretary of Defense cut it short?

15   A.   Yes.

16   Q.   Because you filed the first motion in this case; is that

17   right?

18   A.   That is what I believe to be the case, yes.

19   Q.   You believe the Secretary of Defense is following your

20   criminal case?

21   A.   I believe that there are quite a few people that are

22   involved in the scam that are probably following this case,

23   yes.

24   Q.   Including the Secretary of Defense?

25   A.   Including the person who's responsible for declaring it an

1    emergency, yes, and then authorizing the COVID injections.

2    Q.   Now you've written that it's a crime to say that COVID-19

3    vaccine is safe or effective?

4    A.   They were, umm, authorized under or they were sponsored by

5    the U.S. government under Operation Warp Speed which and

6    they're licensed under 21 CFR 312 which applies 21 CFR 312.7 to

7    any federal official.

8    Q.   But to my question, you've repeatedly written that it's a

9    crime to call the COVID-19 vaccine safe or effective?

10   A.   It's fraud through misrepresentation.

11   Q.   And you believe that this fraud resulted in the death and

12   maiming of Americans, right?

13   A.   It's an actual fact where it was testified in the Senate

14   to where people have been maimed and there have been defense

15   including issues such as myocarditis which is, means that

16   people are going to die within five years of developing that

17   issue and another issue where during the Pfizer trials there

18   was a teenaged girl, who, umm, the -- testified under oath at

19   the Senate that she was a part of the trial and that Pfizer

20   wrote her down as having quote "a stomach ache", but she is

21   rendered to a wheelchair for life, is in pain 24 hours a day

22   and has to be fed through a tube.

23   Q.   And you believe that any death resulting from the COVID-19

24   vaccine is felony murder, right?

25   A.   When they're unlawfully presenting it as generating

1  immunity which is, would be a use that was outside of its

2  license and that was testified in October of 2022 under oath in

3  the European Union by a Pfizer executive that they never tested

4  it for generating immunity which is why they say that it is 95

5  percent effective at preventing COVID-19 because there is legal

6  distinction between SARS-Cov-2 and COVID-19.  SARS-Cov-2 is the

7  virus.  COVID-19 is a disease that sometimes develops from the

8  virus the same as a relation would be between AIDS and HIV.

9  One is a virus; one is the disease.  If medication is licensed

10  to prevent the disease, you cannot claim that it prevents the

11  virus and that's what they did which is fraud which fraud that

12  results in death is a felony murder.

13  Q.  And you said that people who committed this COVID-19 fraud

14  include U.S. government officials, right?

15  A.  That is exactly what the House Intelligence Committee said

16  in AP News like two weeks ago.

17  Q.  I'm asking you, Mr. Carpenter?

18  A.  And I'm confirming what they said.

19  Q.  And you believe that the same U.S. government officials

20  owe their allegiance to Israel; is that right?

21  A.  Yes.

22  Q.  You believe that Israel is currently at war with the

23  United States?

24  A.  I believe that they are at war, but the officials in the

25  United States government aren't recognizing it, yes.

1    Q.   And that Israel is using this biological weapon?

2    A.   They used it in order to funnel money from the taxpayer

3    through companies that are controlled by Jewish Israeli

4    citizens like Pfizer.

5    Q.   You also believe that the same U.S. government officials

6    responsible for the COVID-19 fraud started the war between

7    Russia and Ukraine, right?

8    A.   Yes which started with an incident with attempting to make

9    a NATO country on the boarder of Russia which Russia has been

10   saying since the '80s would cause a war.

11   Q.   They did that to funnel U.S. taxpayer funds to Ukraine?

12   A.   Yes, they did.

13   Q.   Because the Ukrainian president is Jewish?

14   A.   Yes and they're funneling it through corporations within

15   Ukraine.

16   Q.   And you think these same people are involved in Hama's

17   attack on Israel?

18   A.   I think that the only people that benefitted from the

19   Hamas attack in Israel is the Israeli government.

20   Q.   Because you believe that Hamas is funded by Israel?

21   A.   I believe that it's a tactic straight out of book Art of

22   War.  Sometimes when you want a war and your citizens don't

23   want it, it's necessary to dress your citizens in the uniform

24   of your enemy and attack yourself.

25   Q.   So the answer is yes?

1    A.    Yeah.

2    Q.    And you've written to the Court that the war is happening

3    so the U.S. can give billions of dollars directly to Israel; is

4    that right?

5    A.    Through one way or another, yes.

6    Q.    Now you're aware of QAnon, aren't you?

7    A.    Umm, yes.  I believe it's a U.S. government honey pot in

8    order to a track dissenters that are anti-government and

9    identify them and discredit them.

10   Q.    You think the U.S. government is Q or the user of the Q

11   account?

12   A.    Umm, I believe that I sent an e-mail to the U.S.

13   government and it activated immediately after that after being

14   silent for an entire year quoting the e-mail and that it says

15   things in it like find the map, find the key and it's a code

16   that if you scan the website, there are hidden messages in the

17   website.  I've posted the code for it and that would be very

18   easily identified and as valid from another IT professional of

19   computer forensics.

20   Q.    Okay, but back to my question, you believe that the Q user

21   is operated by the U.S. government?

22   A.    By people in the U.S. government.

23   Q.    And that these people in the U.S. government tried to

24   manufacture evidence that you're a pedophile?

25   A.    Umm, yes.  There's evidence to suggest that on Twitter.

1    Q.  And that these people in the U.S. government tried to

2    manufacture evidence that you were suicidal?

3    A.  Again, the code that I wrote verifies that.  Have you,

4    umm, checked it with computer forensics or are you just

5    believing that it's not accurate?

6    Q.  I'm just asking what you believe, Mr. Carpenter, and you

7    believe this, this is all to cover up the fact that Israel

8    attacked the U.S. by releasing the COVID-19 bioweapon?

9    A.  Umm, yes.

10    Q.  Now you've written to the Court that you believe evidence

11    shows that a foreign country has infiltrated the U.S.

12    government, right?

13    A.  Yes.

14    Q.  And that this foreign government is Israel?

15    A.  Yes.

16    Q.  That includes people like the Pfizer CEO?

17    A.  Yes.

18    Q.  And the Michigan attorney general, right?

19    A.  No, that was the FBI asked me a question during the

20    interview of whether or not I knew anybody in the Michigan

21    government that was Jewish and I mentioned that name.

22    Q.  Well, you've repeatedly tweeted about the Michigan

23    attorney general, right?

24    A.  Umm, I have, umm, tweeted about the Michigan governor and

25    questions that I would like to ask her that I believe will lead

```
1    to evidence regarding the involvement of Michigan attorney
2    general, yes.
3    Q.  In the COVID-19 scam, plot, whatever word you'd like to
4    use?
5    A.  Well, it, it involves a lot of lawyers and a lot of
6    doctors.
7    Q.  And you believe that includes the Michigan attorney
8    general?
9    A.  Umm, I believe that evidence will come about to show that,
10   yes.
11   Q.  Because she's Jewish?
12   A.  Umm, because she is a proponent of Israel.  Somebody being
13   Jewish in the government is just a way to, umm, relate a
14   loyalty to that country.
15   Q.  Okay.  So because she is a proponent of Israel then?
16   A.  Yes.
17   Q.  Now you've written to this Court that you are society's
18   messenger to warn us against the threat from Israel?
19   A.  I'm not going to discuss my religion with you, man.
20   Q.  I didn't ask about your religion, I asked what you
21   wrote --
22   A.  Yes, you did.
23   Q.  Mr. Carpenter, if you could please answer my question.
24   You wrote that you are so society's messenger to warn us agains
25   this threat?
```

```
 1   A.   That is a religious belief.

 2   Q.   That is your religious belief?

 3   A.   I just said I'm not discussing my religion with you, man.

 4   Q.   You've written that you're here to save the world to this

 5   Court, haven't you?

 6   A.   Again, it's a religious belief.  There's no reason for you

 7   to be bringing that up.  I'm entitled to my, my First Amendment

 8   beliefs.

 9   Q.   And because of these beliefs, you believe and the

10   government's reaction to the COVID-19 vaccine, the government's

11   reaction triggered your right to revolt against the state of

12   Michigan?

13   A.   That is a legal question that I put forth in the challenge

14   to jurisdiction and since it is based on a state right that is

15   codified in the state constitution, it's beyond the federal

16   court to interpret it which is, it creates an issue where you

17   guys can't actually answer the question of jurisdiction.

18   Q.   And after your revolt, you formed a new sovereign state?

19   Is that right?

20   A.   As was confirmed with the State Department in November.

21   Q.   Last year you wrote the declaration of sovereignty we've

22   talked about?

23   A.   Yep.

24        MR. MOON:  Ms. Cook, Exhibit 14, please?

25   Q.   (By Mr. Moon, continuing):  That's the declaration of
```

1    sovereignty you wrote, the front page, isn't it?

2    A.   Yep.

3         MR. MOON:   Your Honor, I would offer government

4    Exhibit 14.

5         MR. NOGUES:   No objection.

6         THE COURT:   It's admitted.

7    Q.   (By Mr. Moon, continuing):   Sir, you posted this to

8    Twitter?

9    A.   I posted it to Twitter.   I also e-mailed it to the Joint

10   Chiefs of Staff, Michigan government, the governor, the

11   Michigan Senate, the House, umm, the Senate of the United

12   States, the House there as well, Joint Chiefs of Staff, U.N.

13   and two foreign states which is in compliance with the law of

14   nations.

15   Q.   And the president of the United States if I missed that

16   one?

17   A.   Yep, yeah, through the joint chiefs of staff.

18   Q.   And you believe that you were given the key of David or

19   the perfect scenario to declare sovereignty during a solar

20   eclipse?   Is that right?

21   A.   That's partially going to be related to my religious

22   beliefs so I'm going to answer that in saying that the right,

23   the ability to exercise the right and state in the state

24   constitution which again is beyond the federal court to

25   interpret was given to me when I was in court in Michigan and I

1    filed on the docket there that they can either rule that it was

2    unlawful to coerce people to take experimental medication for a

3    use that it's not licensed for or they can acknowledge that

4    they have abandoned their, their duty and they have, no longer

5    have the right to govern because they have placed me in a state

6    of nature with want and a neutral magistrate which is a quote

7    from John Lock in regards to his second treatise and civil

8    liberty which explains when somebody doesn't have a government.

9    Q.   The day you sent this declaration of sovereignty in, you

10   believe that the first of three military helicopters

11   intentionally flew over your house, right?

12   A.   That's not a belief, that's, umm, I can confirm that.

13   Q.   And that these flights occurred are evidence you believe

14   that the President of the United States knows of your claims of

15   sovereignty?

16   A.   That and calling the State Department and them confirming

17   it.  If I called the State Department and told them that I

18   claimed nine square miles of U.S. land under two theories of

19   international law and you believe they just walked me through

20   the ability to obtain a nonimmigrant visa because they

21   confirmed that I have followed the law of nations and then hung

22   up the phone and went out to lunch, I mean, that's silly.  It's

23   their responsibility to make sure that that information got to

24   the President of the United States.

25   Q.   Well, we'll get back to that, but you think the overflight

1    of the helicopters are evidence that the president himself

2    knows of your claims of sovereignty.  Isn't that right?

3    A.   If I sent it to all those government agencies and they,

4    they didn't, it's still assent.

5    Q.   And --

6    A.   And that's just extra proof.  The fact that there was no

7    response to it is in itself an acknowledgment under

8    international law under the law of nations.

9    Q.   That the president or the State Department has failed to

10   dispute your claims is your point?

11   A.   The failure to dispute a claim, a legal claim that if it

12   is placed in both public and in following of the law of nations

13   and as expressed in the Department of Defense law of war

14   manual, chapter one that claims of sovereignty are to be

15   acknowledged as per Congress's intent and that they are to be,

16   and the disputes are to be resolved peacefully.

17   Q.   Now the country you created you said was nine square

18   miles?

19   A.   That's how much land that I, I seized originally, yes.

20   Q.   All within the borders of the state of Michigan?

21   A.   Umm, yes.

22   Q.   Your country is called the Kingdom of Heaven?

23   A.   Yes.

24   Q.   And you're the head of state?

25   A.   Yes.

```
1    Q.   Or king?
2    A.   The definition of nation, the first definition is people
3    who have a common ancestor which means that a nation can be
4    founded by a single individual and there are several instances
5    of this including in all three Abrahamic religions that
6    acknowledge that Abraham and Jacob created a nation, umm, so
7    yeah.
8    Q.   So yes, you're the king of your country?
9    A.   Yes.
10   Q.   And then as you said, you've communicated the creation of
11   your new country to the Department of Justice?
12   A.   Which is under international law just custody, not even
13   necessary.
14   Q.   The Joint Chiefs of Staff?
15   A.   Yes.
16   Q.   The Office of the President?
17   A.   Yes.
18   Q.   You did this via e-mail?
19   A.   And Twitter which both are acceptable electronic means.
20   Q.   And they never responded?
21   A.   Which is acknowledgement under international law.
22   Q.   And that's what you believe is the evidence of the
23   acceptance of the fact that your country exists?
24   A.   The country exists 'cause I declared it to exist and I
25   exercise the right.  Whether or not the U.S. government
```

1    acknowledges it is an entirely different question.

2    Q.   Now before your arrest, you had left Michigan for Texas,

3    right?

4    A.   Yes.

5    Q.   You thought the Oakland County Sheriff's Office and

6    Michigan State Police were trying to take you out?

7    A.   Umm, no, that's not correct.  You got the sheriff's

8    department incorrect and there's a lot more to that including

9    the fact that I reported my ex-girlfriend as committing

10   domestic violence and child abuse and neither of those were

11   acknowledged or investigated in violation of the law of the

12   state of Michigan, umm, which, umm, additionally they came out

13   and arrested me and released me without seeing a magistrate or

14   pressing any charges against me and then were apparently

15   investigating me for stealing my own firearm.

16   Q.   My apologies.  It was the Washtenaw County Sheriff's

17   Office.

18   A.   Yes.

19   Q.   And when you were questioned after your arrest, you said

20   that you thought they were either trying to take you out or

21   manufacture evidence against you; is that right?

22   A.   Yes and including which is a statement that I made to one

23   of the defense attorneys who also said yes, that's exactly

24   what's going on which is something that I said that I wanted to

25   have her called in here for this hearing in order to point that

1   out as a fact.

2   Q.   You --

3   A.   It's not even something that is, something that's going on

4   in my mind.  One of the defense attorneys also acknowledged it.

5   Q.   You also went to Texas looking for a more friendly court

6   venue for your international law claims, right?

7   A.   That was one of the reasons, yes.

8   Q.   Now you've written to this Court that your strategy, you

9   know, with this whole, umm, filing lawsuits has been crafting a

10  giant net with which to insnare criminals, right?

11  A.   Umm, yes and essentially, umm, look, the House

12  Intelligence Committee is investigating the same thing that I

13  filed in court claiming that I wanted to have people subpoenaed

14  to come in here to prove the exact opposite of what that

15  forensic psychologist was saying that it's not in fact a

16  delusion in my mind, that it is in fact actually happening and

17  is a criminal conspiracy and if it is a criminal conspiracy and

18  I have evidence to present to the Court and am not backing down

19  and am not just rolling over every time I hit a road block that

20  prevents me from getting into court like when I went to

21  Michigan and was going there for 11 months and then I hit a

22  wall at the probable cause hearing where the judge ruled don't

23  you think I know it's experimental, it's just a matter of

24  policy to force it on people, every time I hit a wall like that

25  I continue to go on and since I couldn't get past a probable

1    cause hearing by charging people with the crimes that they were

2    actually committing, I got past the probable cause hearing and

3    now we're here.  So yes, that's exactly what I'm doing.

4    Q.   And you believe the FBI is part of this criminal

5    conspiracy?

6    A.   I believe there are members that are part of it that are

7    in, are deeply embedded in our government, yes and have been

8    for decades.  This is just the one they're getting caught on.

9    This is not the only one that they've done.

10   Q.   People in the Department of Justice?

11   A.   Yes.

12   Q.   People in the U.S. Attorney's Office?

13   A.   Umm, yes.  Well, why hasn't Merrick Garland answered the

14   House Intelligence Committee in regards to this special

15   prosecutor request in order to investigate the exact claims

16   that I'm telling you right now?

17   Q.   Mr. Carpenter, you've also demanded that this Court

18   investigate Assistant U.S. Attorney Carlson and I for our

19   attempts to hide evidence, right?

20   A.   Well, it's pretty obvious the injections that are licensed

21   under 21 CFR 312 which the legal definition of experimental

22   medication is anything licensed under 21 CFR 312 and 21 CFR 312

23   got seven applies and your motion for competency, you stated

24   that me claiming that fact was evidence of incompetence.  You

25   also claimed that my challenge to jurisdiction which I'm

1    entitled to as a defense was evidence of incompetence.  Now

2    when I first met my attorney before you guys filed your motion,

3    almost a month before, I said that that was going to be your

4    strategy because that's what the intent of this was going to be

5    was to discredit those two things, that the COVID injections

6    are in fact unlawful to say that they're safe and effective and

7    additionally they were being advertised for a use that was

8    outside of their license and that it's going to be very

9    difficult to beat my challenge to jurisdiction because it

10   requires the federal court to assess whether or not the right

11   that I exercised in the state constitution which is codified in

12   it was exercised properly when this federal court cannot

13   interpret a state constitution.

14   Q.   Mr. Carpenter, you believe that we filed the motion for

15   competency to cover up a conspiracy?

16   A.   I do.  I wouldn't have accused you if I didn't believe

17   that.  I mean --

18   Q.   The conspiracy regarding the COVID injections we've been

19   talking about?

20   A.   You guys are lawyers.  Why are you claiming that it's not

21   unlawful to say that they were safe and effective if they're

22   licensed under 21 CFR 312 and 312.7 specifically says that you

23   cannot claim that they're safe or effective or otherwise market

24   them for the use that they're in testing for?

25   Q.   The conspiracy is the one regarding the COVID injections

1   we've been talking about?

2   A.   Yeah.

3   Q.   You believe that conspiracy even implicates the last two

4   presidents, don't you?

5   A.   The first, first president in that series is the one that

6   signed the executive order that authorized the group from the

7   National Institute of Health that turned around and have

8   Ecoalliance Health ask DARPA for funding to release a modified

9   corona virus into the bat population in China and the current

10  sitting president said what are you waiting for, they're FDA

11  approved when the CDC had publicly posted that Pfizer had no

12  intention of manufacturing the FDA approved version and was

13  going to continue to manufacture the emergency use

14  authorization version because if they manufactured that

15  version, then the other two companies would have to pull theirs

16  off of the market because under 21 U.S.C., 360B(b)B, that one

17  of the stipulations is that there's no FDA-approved ones

18  available which is also why they, umm, why the FDA called a

19  medication horse dewormer when it has a Nobel Prize for use in

20  humans because if it was useful to treat COVID-19, then they

21  would have had to pull the emergency use authorization version

22  vaccines off the market and they didn't want to do that and

23  there's clear evidence of everything that I'm saying.

24  Q.   And you believe both President Trump and President Biden's

25  actions in regards to COVID and the vaccine show their loyalty

1    to a foreign nation?

2    A.   I think their actions while in president, as president in

3    several ways, but not just that show their loyalty to Israel.

4    Look at the, the United Nations vote that just happened when

5    it's the first time they recently activated Article 99 and

6    forced the Security Counsel to meet in regards to what's going

7    on in Gaza right now and the vote was 13 to one out of 15 with

8    one abstaining which was the U.K. government and the United

9    States government vetoed it, so yeah, we have an absolute

10   undying loyalty to a country that uses us as, for taxpayer

11   money and to go send our soldiers off to die in the wars that

12   they want to fight, absolutely and there's a lot of evidence to

13   that and I'm more than happy to go through and present more and

14   more and more evidence in regards to that.  It's not a belief,

15   it's just a fact that some people choose not to believe.

16   Q.   Your efforts to expose the COVID-19 vaccine fraud scam,

17   again whatever you'd like to call it resulted in you being

18   personally targeted.  That's what you believe?

19   A.   Like I said, with the Q user there's an evidence to

20   support that.

21   Q.   Targeted by the U.S. government?

22   A.   Well, I mean, if I send an e-mail to the U.S. government

23   and then the Q user activates and then immediately the, umm, it

24   starts to attempt to manufacture evidence that I'm a pedophile

25   and I'm suicidal, who, who would you draw the conclusion of as

1    responsible for that?

2    Q.   I'm asking you, Mr. Carpenter.  You --

3    A.   China?  I'm asking --

4    Q.   You believe the U.S. government --

5    A.   -- I'm asking you an honest question and to answer your

6    question, that who would, who else would be responsible?  Would

7    China?  Russia?

8    Q.   That's because you believe --

9    A.   My neighbor?

10   Q.   That's because you believe the U.S. government controls

11   the Q person?

12   A.   Yes.

13   Q.   You believe you've been personally targeted by the Israeli

14   government?

15   A.   I believe in regards to all of this, yes, absolutely.

16   Q.   That you've been personally targeted by Pfizer?

17   A.   Well, I'm not sure if it's directly Pfizer, but it's

18   certainly nation-state-level tactics that are going on, yes.

19   Q.   And you see this court case as away to expose the COVID

20   fraud that we've been talking about?

21   A.   Well, it's like I filed in my case, like either it's going

22   to, it's going to come out as a result of the jurisdictional

23   argument and if the jurisdictional argument doesn't go in my

24   favor, then the self-defense argument will and the government

25   is going to have to prove that the people that I'm claiming are

1  responsible are not in fact responsible for committing felonies

2  and you're not going to be able to do that 'cause they are.

3  MR. MOON:  Nothing further at this time, your Honor.

4  THE COURT:  Anything further for the defense?

5  MR. NOGUES:  No redirect, your Honor.

6  THE COURT:  All right and are there any other

7  witnesses for the defense?

8  MR. NOGUES:  No, your Honor.

9  THE COURT:  All right.  Anything else for the

10  government?

11  MS. CARLSON:  No, your Honor.

12  THE COURT:  All right.  I would like both sides to

13  file proposed findings of fact and conclusions of law regarding

14  this motion.  I believe you have to order the transcript and

15  submit those proposed findings of fact and conclusions of law

16  after the transcript is made available to you.  So you'll have

17  to order the transcript, make arrangements with Mr. Yarbrough

18  for that to happen.  Let me get your sense of how much time

19  you'd need the transcript is made available.  How much time

20  would the government need?

21  MS. CARLSON:  I guess that depends on if the

22  transcript is available during the midst of the holidays, but

23  holidays aside, I would say, umm, two weeks.

24  THE COURT:  All right.  How about for the defense?

25  MR. NOGUES:  And then two weeks to respond, your

1    Honor?  We're submitting at the same time, correct?

2              THE COURT:  Same time.

3              MR. NOGUES:  Okay, then the same two weeks is fine,

4    your Honor.

5              THE COURT:  All right.  So I want you to file

6    whatever document you're going to prepare on the docket, but I

7    also would like you to submit it through the utilities function

8    as well and that'll be 14 days after the transcript is made

9    available to you.  If I think a response should be filed to the

10   opposing parties' papers, I'll order that, but I'm not going to

11   do it right now.  Is there anything else we need to address?

12             MS. CARLSON:  No, your Honor.

13             MR. NOGUES:  No, your Honor.

14             THE COURT:  All right.  Then that concludes our

15   hearing for today.  Thank you.

16             (Hearing concluded at 4:51 p.m.)

17                        --    ---    --

18

19

20

21

22

23

24

25

C E R T I F I C A T E

          I, David B. Yarbrough, Official Court

Reporter, do hereby certify that the foregoing pages

comprise a true and accurate transcript of the

proceedings taken by me in this matter on Monday,

December 11th, 2023.


2/2/2024                    /s/ David B. Yarbrough

Date                        David B. Yarbrough,
                            (CSR, RPR, FCRR, RMR)
                            231 W. Lafayette Blvd.
                            Detroit, MI  48226