UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,                              Case No. 23-cr-20152

v.

                                                 HON. MARK A. GOLDSMITH

JACK EUGENE CARPENTER, III,

       Defendant.
_____/

**OPINION & ORDER
FINDING DEFENDANT NOT COMPETENT TO STAND TRIAL**

Defendant Jack Eugene Carpenter, III has been indicted on a charge of transmitting a communication in interstate commerce containing a threat to injure another person, in violation of 18 U.S.C. § 875(c). Indictment at 1–2 (Dkt. 15). The threat was a post on Twitter stating "I'm heading back to Michigan now threatening to carry out the punishment of death to anyone that is jewish [sic] in the Michigan govt if they don't leave, or confess."[1] Id.

The Government moved under 18 U.S.C. § 4241 for a psychiatric or psychological examination to determine whether Carpenter is competent to stand trial. See Gov. Mot. at 1–2 (Dkt. 20). The Court granted the motion and a forensic psychologist conducted a court-ordered examination of Carpenter. The psychologist found that Carpenter suffers from delusional disorder and is not competent to stand trial.

The Court held a competency hearing on December 11, 2023, at which the psychologist and Carpenter both testified at length. See 12/11/23 Hr'g Tr. at 4–94 (Dkt. 92). After the hearing,

---

[1] Twitter is now known as X.

1

both parties submitted proposed findings of fact and law. The Court held a second competency hearing on April 4, 2024, and invited the parties to submit supplemental briefs, which the Government did. See Gov. Suppl. Br. (Dkt. 110).

For the reasons that follow, the Court finds that Carpenter is not fit to stand trial and should be committed to the custody of the Attorney General of the United States for further evaluation and treatment.

## I. BACKGROUND

According to the Government, Carpenter's legal issues began with a series of tweets he posted in February 2023. Gov. Mot. at 2. Carpenter's alleged tweets stated that he was traveling back to Michigan and included threats to kill Jewish members of the Michigan government and any law enforcement officers who tried to stop him. Id. A selection of Carpenter's relevant tweets includes the following:

- February 15, 2023, 07:54:26: @MichStatePolice @WSheriff "I'll be coming back to Michigan, still driving with expired plates. You may want to let everyone know, and Wayne County sheriff as well, any attempt to subdue me will be met with deadly force in self defense. I'll test out that that whole no weapon"

- February 17, 2023, 14:36:391: "Within the next 48 hours I will be back in Michigan. Whether I have to sell more silver or whether my mother, who participated in these acts against me, sends money to get back there after confessing her role to me."

- February 17, 2023, 14:39:51: "Any Jewish person holding a public office on my land after that time is subject to immediate punishment for their participation in an unlawful war of aggression using a biological weapon against me. You may leave, confess and resign to live a private life or"

- February 18, 2023, 03:00:34: @claushetting @DrTedros @POTUS @FBI @CIA @ODNIgov @ADL @Israel @masonicnetwork "I'm heading back to Michigan now threatening to carry out the punishment of death to anyone that is jewish in the Michigan govt if they don't leave, or confess, and now that kind of a problem, because I can Legally do that, right?"

Id. at 2–3. The FBI obtained an arrest warrant for Carpenter on February 18 and arrested him that same day in Texas. Id. at 3. Agents searched Carpenter's car and found seven guns, including a military-style rifle, and hundreds of rounds of ammunition. Id. at 3–4.

The Government contends that, after his arrest, Carpenter told officers that he believes Israel is at war with the United States and is using the COVID-19 vaccine as a biological weapon. Id. at 5. He believed his threats were justified because it is lawful to use deadly force in Michigan against those who have committed a felony and are subject to arrest. Id. at 4. Carpenter also claimed to be a sovereign citizen, having seized nine square miles of land in Michigan and created his own government.[2] Id. at 5.

Based on Carpenter's social media posts and statements made to law enforcement, the Government moved under 18 U.S.C. § 4241 for the Court to commit Carpenter to the custody of the Attorney General for a psychiatric or psychological examination to determine whether he is competent to stand trial. Id. at 1. The Court granted the Government's motion, finding that the Government had identified "several incidents of irrational behavior exhibited by Carpenter that create reasonable cause to doubt his mental competency." See 6/22/23 Order at 2 (Dkt 43). The Court ordered a psychiatrist or psychologist employed by the United States be appointed to examine the mental condition of Carpenter and to file a written report with the Court. Id. at 5.

Dr. Ryan Nybo, a forensic unit psychologist with the Bureau of Prisons, was assigned to conduct a court-ordered evaluation of Carpenter to assess his present competency. 12/11/23 Hr'g

---

[2] "Sovereign citizens believe that they are exempt from the jurisdiction of any legitimate court—state or federal—and often file legal documents to free themselves from the yoke of federal citizenship." Powell v. Michigan, No. 22-10816, 2023 WL 2154954, at *1 (E.D. Mich. Jan. 24, 2023), report and recommendation adopted, No. 22-10816, 2023 WL 2145490 (E.D. Mich. Feb. 21, 2023) (punctuation modified).

3

Tr. at 5, 17. Dr. Nybo received his license to practice psychology in 2007 after receiving his doctorate degree and completing a 2,000-hour predoctoral internship. Id. at 5. As a forensic unit psychologist, Dr. Nybo conducts court-ordered forensic evaluations for United States District Courts throughout the country. Id. at 9. Dr. Nybo has been in his current role for nearly 14 years and has completed roughly 350 competency evaluations and 100 criminal responsibility evaluations. Id. at 11. He has provided testimony nearly 50 times, both as a defense and prosecution witness, and has never failed to qualify as an expert to give testimony. Id. at 9, 15. After conducting voir dire examination of Dr. Nybo, the defense did not object to Dr. Nybo's qualification as an expert in the field of forensic psychology. Id. at 14–16.

As part of his evaluation, Dr. Nybo met with Carpenter in person twice, first for a forensic intake meeting that lasted roughly 45 minutes, then for a follow-up interview that lasted roughly 2 hours and 45 minutes. Id. at 21–23. Dr. Nybo attempted to meet with Carpenter again, but Carpenter refused. Id. at 23–24. In addition to these interviews, Dr. Nybo reviewed the criminal complaint, the Government's supplemental exhibits regarding psychiatric or psychological examination (Dkt. 41), and various pro se motions filed by Carpenter. Id. at 26. In addition, despite refusing to meet with Dr. Nybo again, Carpenter emailed Dr. Nybo on "almost a daily basis." Id. at 24.

Dr. Nybo testified that there is no "typical" amount of time he spends in person with defendants; he has rendered opinions where the defendant has refused to meet with him whatsoever, as well as opinions where he has met with the defendant for more than 15 hours. Id. at 25. Dr. Nybo admitted that he was not able to complete a full evaluation of Carpenter, but he believes he was nonetheless able to render an opinion regarding competency. Id.

Carpenter provided Dr. Nybo with a "limited account" of his personal history, which the Court summarizes here. See Nybo Competency Evaluation at 3. Prior to COVID-19, Carpenter worked as an IT specialist at the University of Michigan. Id. at 2. Carpenter had no history of medical or psychological concerns, but he did have a history of emotional abuse. Id. at 6. According to Dr. Nybo, Carpenter's life "spiral[ed] out of control" after the emergence of the COVID-19 pandemic. Id. at 2. Carpenter believed that Pfizer, the maker of a COVID-19 vaccination, "was a nation state with military bases and was either associated or controlled by [the] Israeli government who had also infiltrated the United States government." Id. Carpenter began "expos[ing]" Pfizer on social media and came to believe that Pfizer was targeting him and viewing him as a "considerable threat." Id. Carpenter ultimately lost his job at the University of Michigan for refusing the COVID-19 vaccine. Id. at 2, 4.

Carpenter claims that he used his IT knowledge to examine the source code of a QAon website, which confirmed that "Pfizer, with its ties to Israel, had infiltrated the United States government" and developed a "character assignation [sic]" plot against Carpenter. Id. at 2. Carpenter "grew fearful that his life was in danger." Id. He believed that Pfizer planted posts online attributed to him as part of a plan to kill him and make it look like he was a sex offender who committed suicide. Id. Following this discovery, Carpenter left Michigan and began traveling around the country, believing that he needed to keep moving to remain safe. Id. Carpenter wanted the police to "open an investigation into what was happening to him," so he drove around with expired license plates and voluntarily presented at police stations, but he was advised that law enforcement could not help him. Id. at 2–3. After the FBI became aware of Carpenter's tweets threatening Jewish officials in Michigan, they located and arrested Carpenter in Texas. Id. at 4.

According to Dr. Nybo's findings, "Carpenter harbors a complex delusional system that involves a belief he is being individually targeted for exposing that the COVID-19 vaccine was being used illegally," and "Carpenter is preoccupied with these beliefs and has no insight into his mental illness." Id. at 7. Dr. Nybo reported that "while suspicious and guarded," Carpenter nevertheless "almost spoke nonstop about the vaccine, being individually targeted for refusing the vaccine, and those whom he felt were responsible." Id. at 6. Dr. Nybo found it difficult to redirect Carpenter, "as he was fixated on grandiose and persecutory delusional ideas." Id.

Ultimately, Dr. Nybo found that Carpenter meets the diagnostic criteria for delusional disorder, grandiose and persecutory types, and recommended that Carpenter undergo formal competency restoration procedures at a federal medical center. Id. at 7, 9.

In addition to the information Carpenter shared during his interviews with Dr. Nybo, the record before the Court includes more than 50 pro se motions and letters that Carpenter has filed since March 2023.³ Finding that Carpenter was attempting to proceed in a hybrid manner (i.e.

---

³ These letters and motions further illustrate Carpenter's bizarre thinking. For example, in various documents, Carpenter states the following:

- "[The U.S. President] got outwitted in an international arms issue where he ceded U.S. land to a random person who simply used email and a telephone. The DOJ is weaponized, and this is simply a smear campaign. Something for the TV to use to get people to emotively dismiss me without listening." 7/18/23 Letter at PageID.265 (Dkt. 53) (punctuation modified).

- (Addressed to "Mr. Secretary of Defense"): "I see you. This couldn't happen without you. Confess, resign, and live a private life. I know you are following this case. Are you the one 'following orders'? Or are you the one giving them? We shall see. 'When the dragon realized that he had been thrown down to earth, he pursued the woman who had given birth to the male child . . . .' The government I created is God's law on earth. It will rule all nations of the earth with an iron rod." 11/30/23 Letter at PageID.391–392 (Dkt. 72).

- "It's important to note that I was given the 'key of David' or the perfect scenario to declare sovereignty, to open the door' to found a nation on Oct. 25ᵗʰ & 27ᵗʰ, 2022 during a solar eclipse, and the Tarot readings said that I would try something that would at first appear as

6

both through counsel and pro se by way of his own submissions), the Court initially struck Carpenter's filings. See 5/24/23 Order (Dkt. 35). Carpenter then raised an issue of ineffective counsel, see 6/14/23 Letter (Dkt. 40), and filed a motion to remove counsel, see 11/13/23 Mot. to Remove Counsel (Dkt. 64). The Court stopped striking Carpenter's filings while these issues, and the Court's determination regarding competency, remained pending.

Carpenter wishes to remove his attorney, Jean Pierre Nogues, III, because Nogues refuses to argue that the Court lacks personal jurisdiction over Carpenter. Central to that defense is Carpenter's claim that he was forced to create his own sovereign named "The Kingdom of Heaven" because the State of Michigan refused to recognize that requiring the use of an experimental medication, the COVID-19 vaccine, was a crime. See Gov. Suppl. Exs. at PageID.205 (Dkt. 41).

---

if it failed, but I would realize I was given a gift. Then I went home and wrote the declaration of sovereignty while going through the motions required to seize land under the Law of War chapter 11.3 as adopted by Congress." Id. at PageID.392–393.

- "Are people working in a coordinated effort to discredit me? Well, it's pretty obvious they are. Even the Marshals saw it. Because I am right. People loyal to a foreign government released a biological weapon to launder money through Israeli controlled corporations, stealing from the American Taxpayer. That was an act of war, and U.S. public officials facilitated it, committing treason among other crimes. That is motive to target me, and a fact for the jury to determine. The House Intelligence Committee almost sees it. They think it was leaked on accident, not released on purpose. Why has the Attorney General not looked into it? Treason, involved. Why are the US Attorneys claiming facts are delusions? Treason, involved." 12/20/23 Letter at PageID.436 (Dkt. 82).

- (Addressed to "Lloyd Austin"): "There are occurrences that seem to be lined up with events in my life that are hard to ignore. The arrest of Epstein or the disappearance of the Queen of England on my birthday; the former Pope's death on Dec. 31, 2021 and the expiration of the second Letter of Marquis triggering the reprisal; your 'complication' of an elective surgery on December 31, 2023. I wonder if you were moved to the ICU on January 5th when I was told to leave Michigan where I would be arrested in Texas, which I knew was coming. I can't let you all know everything I know when I know it, otherwise things change and the outcome [sic] hard to track. I suspected that the Master of puzzles was either you or Emory Tate Jr., the one who falls but not by human hands." 1/11/24 Letter at PageID.463 (Dkt. 86).

7

According to Carpenter, The Kingdom of Heaven occupies 9-square miles in Michigan. Id. at 206. Carpenter, as the ruler of this sovereign, is known as the "King of Israel." Id. at PageID.205.

Carpenter testified that he sent a 15-page document that he titled a "declaration of sovereignty" to several heads of state, including the President of the United States, the U.S. House of Representatives, the U.S. Senate, the Governor of Michigan, the United Nations, and two foreign states. See 12/11/23 Hr'g Tr. at 83. Carpenter insists that the State Department and the President are aware of his claims of sovereignty, and he testified that, on the day he circulated his declaration, the first of three military helicopters intentionally flew over his house. Id. at 84. Carpenter believes that by failing to dispute his declaration, the Government has assented to his sovereignty. Id. at 85. Carpenter argues that the Court lacks personal jurisdiction over him because he is the head of state of a foreign nation. See, e.g., 1/23/24 Mot. to Dismiss at PageID.485 (Dkt. 89).

Based on the testimony of Dr. Nybo and Carpenter, as well as Carpenter's pro se filings, the Court finds by a preponderance of the evidence that Carpenter is currently suffering from a mental disease or defect rendering him not competent to stand trial at this time.

## II. ANALYSIS

"It is well established that the Due Process Clause of the Fourteenth Amendment prohibits the criminal prosecution of a defendant who is not competent to stand trial." Medina v. California, 505 U.S. 437, 439 (1992). The test for competency is whether the defendant has (i) "a rational as well as factual understanding of the criminal proceedings against him" and (ii) "a sufficient present ability to consult with his counsel with a reasonable degree of rational understanding." United States v. Dubrule, 822 F.3d 866, 875 (6th Cir. 2016) (quoting Dusky v. United States, 362 U.S. 402, 402 (1960)). If the court finds "by a preponderance of the evidence that the defendant is

8

presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense," the defendant must be committed to the custody of the Attorney General, who will "hospitalize the defendant for treatment in a suitable facility." 18 U.S.C. § 4241(d).

"[T]he bar for incompetency is high." United States v. Miller, 531 F.3d 340, 350 (6th Cir. 2008). In determining competence, the Court should consider "several factors, including evidence of a defendant's irrational behavior, [the defendant's] demeanor at trial, and any prior medical opinion on competence to stand trial." Id. at 348 (punctuation modified). Ultimately, there are no factors or thresholds that, if met, will conclusively determine incompetency. Cowans v. Bagley, 639 F.3d 241, 247 (6th Cir. 2011) ("'There are, of course, no fixed or immutable signs' of incompetence, the standard is a high one, and the relevant factors—'evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence'—'are difficult to evaluate.'") (quoting Drope v. Missouri, 420 U.S. 162, 180 (1975)).

The Court first addresses the threshold question of whether Carpenter is presently suffering from a mental disease or defect. Finding that Carpenter is presently suffering from delusional disorder, the Court then analyzes the two-prong test for competency. Because the Court finds that Carpenter cannot consult with his lawyer with a reasonable degree of rational understanding, the Court finds that Carpenter is not fit to stand trial.

### A. Mental Disease or Defect

Dr. Nybo found that Carpenter meets the diagnostic criteria for "delusional disorder, grandiose and persecutory types." See Nybo Competency Evaluation at 7. The Government agrees with Dr. Nybo's diagnosis, see Gov. Suppl. Br. at 2, but the defense argues that Dr. Nybo's diagnosis relies on unsubstantiated assumptions, see Def. Proposed Findings of Fact and Conclusions of Law (PFFCL) at 14. As explained below, the Court adopts the findings of Dr. Nybo and concludes that Carpenter is presently suffering from delusional disorder.

The Diagnostic and Statistical Manual of Mental Disorders (DSM) defines delusions as "fixed beliefs that are not amenable to change in light of conflicting evidence." Diagnostic & Statistical Manual of Mental Disorders, 5th ed. (2013). As explained by Dr. Nybo, "[t]he grandiose type [of delusional disorder] applies when the central theme involves a conviction of having a great talent or insight, while the persecutory type involves a belief of being conspired against, maliciously maligned, harassed, followed, poisoned or drugged." Nybo Competency Evaluation at 7. Carpenter's beliefs—including a belief that Pfizer, Israel, and the federal government have targeted him for exposing that the COVID-19 was being used illegally—constitute both grandiose and persecutory delusions.

The defense argues that the lack of conflicting evidence available to disprove Carpenter's theories precludes a finding that his beliefs are delusional. See Def. PFFCL at 14. But the defense cites no cases supporting such an argument, and this Court is aware of none. In fact, courts have found defendants to suffer from delusions without pointing to any conflicting evidence that was presented to the defendant or the court. See, e.g., United States v. Franklin, No. 7:19-mj-2, 2020 WL 748181, at *4 (E.D. Ky. Feb. 14, 2020) (finding that the defendant had an "immutable attachment to non-reality based beliefs"—including an alleged relationship with celebrity Katy

Perry—and was unable "to critically assess those beliefs when challenged" without stating what, if any, evidence was presented to the defendant or the court); United States v. Rodman, 446 F. Supp. 2d 487, 493–494 (D.S.C. 2006) (finding that defendant who believed "he [wa]s being persecuted by an interconnected group of governmental agencies . . . as the result of his expression of his unpopular political views" suffered from "delusional beliefs" that rendered him not competent to stand trial without any discussion of conflicting evidence presented to the defendant or the court).

The Court concludes that there is no legal requirement that Carpenter had to be presented with conflicting evidence in the face of which he remained unshaken in his beliefs. And any such requirement would be unwise, as it would give a defendant an easy way to avoid an incompetency finding by the simple expedient of refusing an evaluation. The Court also concludes that there is no legal requirement that this Court must be presented with evidence that conflicts with Carpenter's beliefs. Any such requirement would be unworkable, as it would put the Government to the impossible task of disproving the vast conspiracy Carpenter imagines. And how exactly that would be done is not laid out by the defense. All that is required is an examination of the record to determine whether Carpenter's beliefs are so significantly beyond the pale of plausibility as to constitute delusions. An examination of the record confirms just that.

Carpenter's fixed belief system is not simply a view about how the world operates; it is about how he has uncovered an evil partnership that has now decided to eliminate him to protect itself. And the belief system is built on a long list of plainly bizarre undertakings. As described above, Carpenter believes that the State Department sponsored a QAnon website that was specifically designed to make Carpenter look like he had an interest in child pornography and trick him into clicking links for suicide prevention hotlines. See 12/11/23 Hr'g Tr. at 32–33. According

to Carpenter, this was part of the State Department's plan to kill him and make it look like a suicide attempt. Id. Carpenter also believed that his girlfriend of eight years was "assigned to [him]" by the CIA and "offered a promotion to mentally break" him before he could expose that the COVID-19 vaccine is illegal. See Gov. Suppl. Exs. at PageID.197. And as previously mentioned, Carpenter testified that after circulating his declaration of sovereignty, three military helicopters flew over his house. See 12/11/23 Hr'g Tr. at 84–85. The defense admits that it is "without dispute that [Carpenter] believes he is being targeted by the government—i.e., 'persecuted'—for his [] beliefs and actions." Def. PFFCL at 15.

The sense of grandiosity and persecution reflective in Carpenter's views separates him from others who hold conspiratorial views about COVID-19. Many have questioned the origins of the disease and the motivations of governments and pharmaceutical companies in responding to it. But it is the grandiosity and persecution complex that transforms Carpenter from a conspiracy theorist without mental health challenges into a deluded one. As Dr. Nybo's report explains, "unlike those who subscribe to conspiracy theories, individuals with persecutory delusions are almost always the individual target of the presumed conspiracy and their delusions are typically idiosyncratic beliefs based on subjective experience and not shared by others." Nybo Competency Evaluation at 7. Unlike the "many, many Americans" with similar beliefs regarding the COVID-19 vaccine, Def. Resp. to Gov. Mot. at PageID.54 (Dkt. 21), Carpenter believes that he is being specifically targeted for sharing those beliefs. Even the defense concedes that "it strains credulity to assert that so many actors on the world stage are personally aware of and active in attempting to suppress [Carpenter]." Def. PFFCL at 15–16. This is where Carpenter's beliefs cross the line from conspiracy theories to delusions.

12

These exceedingly implausible beliefs are not incidental or marginal in his life. They dominate his thinking. See, e.g., Nybo Competency Evaluation at 9 (explaining that Carpenter is "fixated on his delusional beliefs").

Looking at all the evidence, the Court concludes that Carpenter suffers from a delusional disorder that amounts to a mental disease or defect.

### B. Understanding of the Proceedings

The first prong of the Sixth Circuit's test for competency is whether the defendant has "a rational as well as factual understanding of the criminal proceedings against him." Dubrule, 822 F.3d at 875. The Government argues that "Carpenter's delusions impair his ability to rationally understand the nature and consequences of the court proceedings against him and to assist in his defense." Gov. PFFCL at 14. The defense, on the other hand, argues that "[b]oth during Dr. Nybo's evaluation and during [Carpenter's] hearing testimony, [Carpenter] established a competent understanding of the nature of the proceedings against him and the roles of the various parties to those proceedings, including his defense attorney and this Court." Def. PFFCL at 14.

In his report, Dr. Nybo stated that Carpenter seems to have a factual understanding of court procedures, but that "his ability to rationally understand the nature and consequences of the court proceedings against him is impaired." Nybo Competency Evaluation at 8. When asked to elaborate on this finding during the competency hearing, Dr. Nybo explained that Carpenter "understands the roles of the courtroom participants. He understands the role of the judge. He's written many motions and letters to the judge. He understands what the prosecutor's role is as well as his defense counsel's role." 12/11/23 Hr'g Tr. at 40. But at the same time, Dr. Nybo explained that while Carpenter "understands he's charged with making a threat," he believes he "had the right to do so," and that once he exposes the corruption of Pfizer and the Israeli

13

government, any jury would "exonerate him" so he "wouldn't really face any consequences to [the threat]." Id.

Carpenter testified that he understands that he has been charged with making threats over interstate communication and that a competency evaluation was being conducted. Id. at 65. He stated on the record that he was able to follow what was happening during the first competency hearing. Id. at 66. He also took notes and asked his defense counsel to ask certain questions of Dr. Nybo. Id. Carpenter spoke clearly about the roles of his defense attorney, the prosecuting attorneys, and the judge. Id.

After considering all available evidence, the Court is unable to conclude that Carpenter does not have a rational understanding of the proceedings against him. Carpenter appears to understand our judicial system, the roles of the attorneys and the judge, and the crime with which he has been charged. His optimism that a jury will exonerate him does not necessarily amount to an irrational understanding of the proceedings, even if it is based on a delusional belief. Taking all of the above into account, the Court finds that Carpenter has a rational understanding of these proceedings.

Nevertheless, the Court finds that Carpenter is not competent to stand trial because he is unable to assist in his defense, as explained below.

### C. Ability to Assist in Defense

With respect to the second prong, Dr. Nybo found that Carpenter will not be able to rationally assist his counsel with his defense. See Nybo Competency Evaluation at 9. The Government agrees with Dr. Nybo, arguing that "Carpenter's ability to consult with counsel is entirely informed by his delusions, and thus impair[s] his ability to assist in his defense." Gov. PFFCL at 15. Defense counsel offered little argument to the contrary, discussing Carpenter's

14

ability to assist with his defense in its proposed findings of fact and law only briefly. For the reasons that follow, the Court agrees with Dr. Nybo and the Government.

Courts have noted that the requirement that a defendant be able to assist in his own defense is less often discussed in case law than the requirement that a defendant understand the nature of the proceedings against him, but it remains an analytically distinct requirement for competency. See, e.g., United States v. Salley, 246 F. Supp. 2d 970, 977 (N.D. Ill. 2003) ("[W]hether [a] defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . though less frequently focused on in the case law, adds independent content to the judicial inquiry beyond the [other] . . . factor.") (punctuation modified); United States v. Roberson, No. 3:21-cr-50041-1, 2023 WL 3305132, at *7 (N.D. Ill. May 8, 2023) ("The two prongs of the competency test—understanding the proceedings and assisting in one's defense—are analytically distinct.").

The Seventh Circuit has explained that "[a] defendant's role in assisting counsel in his own defense is to recognize and relate relevant information to counsel and make the few trial-related decisions reserved for defendants (i.e., whether to plead guilty, whether to request a jury trial, whether to be present at trial, and whether to testify"). Newman v. Harrington, 726 F.3d 921, 935 (7th Cir. 2013) (punctuation modified). Cooperation with counsel has been described as "the capacity to provide whatever assistance counsel requires in order to explore and present an adequate defense.'" Salley, 246 F. Supp. 2d at 977 (N.D. Ill. 2003) (quoting R. Bonnie, "The Competence of Criminal Defendants: Beyond Dusky and Drope," 47 U. Miami L. Rev. 539, 552 (1993) and Dusky, 362 U.S. at 402).

These principles are illustrated in United States v. Krueger, No. 13-cr-561, 2017 WL 2349600, at *1 (N.D. Ohio May 31, 2017), where a defendant suffering from a delusional

15

disorder—believing that his adoptive parents abused him, despite no reports of abuse by any doctors or social agencies—was found to lack the ability to assist in his own defense. See Krueger, 2017 WL 2349600, at *1–*2. The court explained that "[a] delusion . . . necessarily means that [defendant's] decision making process will be irrevocably altered by his mental illness" and that "[defendant's] testimony would be in constant danger of becoming prejudiced or self-incriminating solely on the basis of his mental illness." Id. at *2. The court also emphasized that "[defendant's] beliefs will almost certainly never change despite all evidence to the contrary." Id.

Considering these principles, the Court finds that Carpenter lacks the ability to assist in his own defense. First and most important, Carpenter's delusional disorder will prevent him from developing a defense strategy based on anything other than his delusions. Carpenter's fixation on his jurisdictional argument is particularly troublesome, as demonstrated by his numerous pro se filings. Carpenter has filed at least five pro se motions arguing that the Court lacks personal jurisdiction over him, an argument which is based on Carpenter's delusional belief that he is the ruler of a sovereign nation.[4] He has also filed an appeal—ultimately dismissed—attempting to raise the jurisdictional issue. See 4/2/24 Order from U.S. Court of Appeals – Sixth Circuit (Dkt. 111). Carpenter has maintained this position despite explanations from his attorney that it is not a good defense at law. See, e.g., 12/11/23 Hr'g Tr. at 69. This leads the Court to believe that Carpenter will continue to fixate on his jurisdictional defense.

At the second competency hearing, Nogues stated on the record that he and Carpenter had discussed other defenses in addition to Carpenter's jurisdictional argument. But Nogues declined

---

[4] For motions referencing Carpenter's jurisdictional argument, see, e.g., 7/18/23 Mot. (Dkt. 50); 11/21/23 Mot. (Dkt. 67), 12/14/23 Mot. (Dkt. 80), 1/23/24 Mot. (Dkt. 89), 2/13/24 Mot. (Dkt. 93). Carpenter also references his jurisdictional argument in numerous letters filed with the Court. See, e.g., 12/12/23 Letter (Dkt. 79), 12/27/23 Letter (Dkt. 84), 3/12/24 Letter (Dkt. 103).

to state what these defenses were; he also failed to state that Carpenter would entertain defenses other than jurisdiction.

There is evidence in the record that Carpenter might entertain a defense based on self-defense, having told Dr. Nybo that "it was lawful to use deadly force in Michigan against those who have committed a felony and are subject to arrest" (referencing Michigan officials who claimed that the vaccine is safe and effective). See Nybo Competency Evaluation at 4. Carpenter also testified that he would claim self-defense, forcing the Government "to prove that the people that I'm claiming are responsible are not in fact responsible for committing felonies and you're not going to be able to do that 'cause they are." 12/11/23 Hr'g Tr. at 93–94. But this "defense" is premised on Carpenter's delusional belief that he was a target of the vast conspiracy, which justified his use of threats. No valid defense for threats made to Jewish members of the Michigan government could be mounted based on a conspiracy theory that Carpenter has been targeted.

Second, the Court is concerned that Carpenter would be unable to work with any counsel appointed to him, not just Nogues. Dr. Nybo testified regarding his belief that "if defense counsel does not go along with [Carpenter's] delusional beliefs . . . then [] he'll fire whatever attorney he's being represented by." 12/11/23 Tr. at 41. Dr. Nybo explained that in his experience, Carpenter's conflict with Nogues is different from that of many defendants who are sent to him for evaluation but are not suffering from a present disease or defect. Id. at 42. According to Dr. Nybo, the fact that Carpenter is suffering from delusions affects his ability to develop rational strategies for trial, which separates him from other defendants who have conflicts with their attorneys but are still able to strategize rationally. Id. at 43.

In sum, the Court does not think Carpenter, in his current state of mental health, will be able to rationally assist his counsel.

17

### III. CONCLUSION

For the foregoing reasons, the Court finds that Carpenter is not fit to stand trial and should be committed to the custody of the Attorney General for further evaluation and treatment. The parties must submit to the Court, within 14 days of this opinion and order, a proposed order to accomplish that. If they cannot agree on the form of the order, the Government must file a motion for entry of a proposed order within the 14-day period; the defense must file a response within 14 days thereafter.

SO ORDERED.

Dated: May 10, 2024　　　　　　　　　　　　　s/Mark A. Goldsmith
　　　　Detroit, Michigan　　　　　　　　　　　MARK A. GOLDSMITH
　　　　　　　　　　　　　　　　　　　　　　　United States District Judge